**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

**FEDERAL TRADE COMMISSION,**

    **Plaintiff,**

v.                                                                        Case No. 8:09-cv-2309-T-23TBM

**WASHINGTON DATA RESOURCES,
et al.,**

    **Defendants.**
_____/

**REPORT AND RECOMMENDATION**

THIS MATTER is before the court on an order to show cause why, pending a final decision on the merits of the Federal Trade Commission's complaint, a preliminary injunction should not issue enjoining the defendants from further violations of the law and continuing the freeze of the defendants' assets. *See* (Doc. 19 at 14). A hearing was conducted on November 23, 2009.[1] For the reasons set forth below, it is RECOMMENDED that a limited preliminary injunction should issue as to Defendant Richard A. Bishop.

---

[1] Since the entry of the temporary restraining order with asset freeze, the FTC has entered into stipulated preliminary injunctions with the following defendants: Bruce Meltzer; Tyna Caldwell; Kathleen Lewis; Optimum Business Solutions, LLC; Crowder Law Group, P.A. (Docs. 29, 35); and Douglas A. Crowder (Docs. 34, 49). Subsequent to the hearing, a stipulated preliminary injunction was also agreed to by Brent McDaniel. (Doc. 51). The FTC advises that the stipulation is adequate to also address the activities of Washington Data Resources, Inc., McDaniel's company, which has not made an appearance in the case. Thus, on the matter of the preliminary injunction, the only defendant left to address is Richard A. Bishop.

I.

On November 13, 2009, the court granted in part Plaintiff's Motion for Temporary Restraining Order With Asset Freeze, Appointment of a Receiver, and Order to Show Cause Why a Preliminary Injunction Should Not Issue (Doc. 2) as to each of the Defendants. (Doc. 19). By its motion, the FTC generally sought to enjoin the Defendants from further conduct pertaining to their mortgage loan modification and foreclosure relief services. The temporary restraining order ("TRO") enjoined Defendants, in connection with any advertising, marketing, promotion, offering for sale or sale of any loan modification or foreclosure relief service, from falsely representing or assisting others who are falsely representing that any defendant or other person will (a) obtain or arrange a modification of any term of a consumer's home loan; (b) obtain or arrange lower monthly mortgage payments for any consumer; (c) obtain or arrange affordable monthly mortgage payments for any consumer; (d) obtain or arrange lower interest rates on any home loan for any consumer; (e) stop, prevent, or postpone any home mortgage foreclosure sale; (f) save any consumer's residence from foreclosure; (g) prevent a notice of default from being filed with respect to any consumer's residence or home loan; (h) obtain or write a new home loan for any consumer; (i) obtain or arrange a forbearance from any mortgage loan holder or servicer; (j) obtain or arrange any agreement whereby any consumer's mortgage payments are deferred for any period of time; or (k) immediately or promptly contact any consumer's mortgage loan holder or servicer. Defendants were also barred from falsely representing or assisting others in falsely representing the degree of success that any defendant has had in performing any mortgage loan modification or foreclosure relief service; the length of time that any defendant

has been providing mortgage loan modifications or foreclosure relief services; the nature, expertise, position, or job title of any employee, agent, representative, contractor, independent contractor, or any other person who provides any service to any defendant; the terms that any mortgage loan holder or servicer will or is likely to offer or accept to cure any delinquency or default on, or to reinstate, any mortgage; the amount of time it will take or is likely to take for any defendant to obtain or arrange a modification of any term of a consumer's home loan; the nature of any defendant's relationship with any mortgage loan holder or servicer, or other lender, that any defendant is affiliated with, endorsed or approved by, or otherwise connected to the United States Government or any federal homeowner relief or financial stability program; or any other material fact. (Doc. 19 at 4-5).

In connection with the telemarketing, advertising, marketing, promotion, offering for sale, or sale of any mortgage loan modification or foreclosure relief service, it further restrained and enjoined defendants from violating any provision of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 3, including, but not limited to, sections 310.3(a)(2)(iii) and 310.3(a)(2)(vii) of the same, and from requesting or receiving payment of any fee or consideration or any kind of advance of performing each and every mortgage loan modification or foreclosure relief service that any defendant contracted to perform or represented would be performed. (Doc. 19 at 6).

In addition to the temporary restraining order, the court imposed an asset freeze as against the property of each of the defendants, prohibited the defendants from disclosing customer lists, and ordered the collection and preservation of the defendants' records. Although requested by the FTC, the court did not appoint a receiver.

The FTC now seeks the imposition of a preliminary injunction and other equitable relief of essentially the same character as granted by the TRO. The FTC alleges that there is good cause to believe that the defendants have engaged in, and are likely to engage in, acts or practices which have violated or will violate Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). In support of this contention, the FTC proffers that the corporate defendants have engaged in a common enterprise whereby they advertised, marketed, offered to sell, and sold to consumers mortgage loan modification and foreclosure relief services in violation of Section 5 of the FTC Act and the TSR.[2] The FTC asserts that the defendants have mislead and frustrated consumers through an ongoing and pervasive pattern of deceptive practices by misrepresenting that, by paying a $2,000.00 fee, consumers will receive mortgage loan

---

[2]According to the FTC, the scheme involved defendants and their agents mailing postcards to consumers in financial straits that invited the consumers to call a toll-free number for more information. The postcards represented that they came from a government agency and had return addresses with official sounding names. Via the postcards, defendants promised to provide consumers a lower mortgage payment and lower interest rate, and indicated that the recipient was "PRE-QUALIFIED." Consumers who called the telephone number on the postcard spoke with defendants' representative, and, in many instances, defendants told consumers that they were a law firm. They also told consumers that they would negotiate with a consumer's mortgage lender to convince the lender to waive late fees and attorneys' fees, lower the interest rate, change an adjustable rate mortgage rate to a fixed rate, and reduce the principal balance so that the monthly mortgage payment was reduced. During such call, defendants' representative obtained detailed financial information about the consumer's mortgage, income, and expenses. Upon qualification, defendants arranged for the consumers to pay a $2,000.00 loan modification fee, in lump sum or by installments of $500.00 or $1,000.00 each. Defendants would then send a written agreement to the consumers for signature. The agreement directed the consumers to have no contact with the their lender. After returning the agreement, the consumers might get a call from the attorney whose name appeared on the written agreement. Other than this phone call, wherein the attorney explained the loan modification process or if necessary, filed bankruptcy pleadings, the attorney had little if any involvement with the consumers. After the consumers submitted documentation of their financial condition, consumers found that they could not reach any of defendants' representatives. In many instances, defendants failed to obtain the promised mortgage loan modifications. Compl. (Doc. 1).

modifications that will make their mortgage payments substantially more affordable.
Claiming a likelihood of success on the merits of the underlying suit and urging that such conduct as is demonstrated results in immediate and irreparable harm to the consuming public and because a continuing injunction is in the public interest, the FTC urges it is entitled to such relief.

The FTC also seeks a continuation of the asset freeze, which it urges is necessary to avoid the dissipation of assets. At the hearing, the FTC conceded that the remaining assets of the Defendants do not support the appointment of a receiver. Thus, the court need not address the matter of the appointment of a receiver further on this motion. The FTC supports its request for a preliminary injunction with its Memorandum of Points and Authorities in Support (Doc. 3) and numerous exhibits including affidavits, declarations, and various other documents (Docs. 4-16, 31).

## II.

### A.

Rule 65 of the Federal Rules of Civil Procedure governs the entry of a preliminary injunction. The purpose of a preliminary injunction is to maintain the *status quo* until the court can enter a final decision on the merits of the case. *United States v. DBB, Inc.*, 180 F.3d 1277, 1282 n.5 (11th Cir. 1999); *see also Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).[3] A [private] party seeking temporary injunctive relief must establish (1) a

---

[3]In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

substantial likelihood of success on the merits; (2) irreparable injury if the injunction is not granted; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004). "[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the 'burden of persuasion' as to each of the . . . prerequisites."[4] *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) (citing *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989)).

B.

Section 5(a) of the FTC Act prohibits unfair or deceptive acts or practices in or affecting commerce. 15 U.S.C. § 45(a)(1). To establish that an act or practice is deceptive under that section, the FTC must establish that (1) there was a representation, (2) the representation was likely to mislead consumers acting reasonably under the circumstances, and (3) the representation was material. *FTC v. Tashman,* 318 F.3d 1273, 1277 (11th Cir. 2003). A representation is material if it is of a kind usually relied upon by a reasonably prudent person.[5] *FTC v. Amy Travel Serv. Inc.,* 875 F.2d 564, 573 (7th Cir. 1989). Material

---

[4] A plaintiff may support its motion for a preliminary injunction by setting forth allegations of specific facts in affidavits. M.D. Fla. R. 4.05(b)(2), 4.06(b)(3). In considering a motion for preliminary injunctive relief, a district court may rely on affidavits and hearsay materials that would not be admissible as evidence for entry of a permanent injunction. *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).

[5] Proof of reliance upon misrepresentations or misleading statements by each purchasing consumer is not required for equitable relief. *McGregor v. Chierico*, 206 F.3d 1378, 1388 (11th Cir. 2000) (quoting *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605 (9th Cir. 1993)). Actual reliance is presumed once the FTC establishes that the defendant made

6

misrepresentations or omissions made to induce the purchase of goods or services constitute deceptive acts or practices violate this section. *See FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988); *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999). Such acts or practices may be unfair or deceptive without an intent to deceive or cause consumer injury. *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1368 (11th Cir. 1988).

C.

Pursuant to the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6101, *et seq.*, Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices. The FTC promulgated in its TSR specific prohibitions of deceptive telemarketing acts and practices. 16 C.F.R. §310.3. The TSR exempts from coverage telephone calls initiated by a customer in response to a direct mail solicitation unless the solicitation fails to clearly, conspicuously, and truthfully disclose all material information listed in Section 310.3(a)(1) of the TSR, including the total costs to purchase, receive, or use the good or service that is the subject of the sales offer. 16 C.F.R. § 310.6(b)(6). Under the TSR, telemarketers are prohibited from:

>   (2)   misrepresenting, directly or by implication, in the sale of goods or services any of the following information:
>   \*\*\*
>   (iii) Any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of the a sales offer;

---

material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product. *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1266-67 (S.D. Fla. 2007). Express claims, or deliberately made implied claims, used to induce the purchase of a particular product or service are presumed to be material. *See id.*

*\*\*\**
> (vii) A seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity.

16 C.F.R. § 310.3(a)(2)(iii), (vii). A violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act. 15 U.S.C. §§ 45(a), 57a(d)(3), 6102(c).

### D.

Upon a reasonable belief "that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission," the FTC is authorized to bring suit in district court to enjoin such violations. 15 U.S.C. § 53(b). "Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest . . . a preliminary injunction may be granted without bond. . . . ." *Id.* Thus, when determining whether to issue a preliminary injunction, a court must consider the likelihood that the FTC will succeed on the merits and balance the equities involved. *FTC v. Univ. Health Ctr.*, 938 F.2d 1206, 1217 (11th Cir. 1991) (citing *FTC v. Warner Commc'ns*, 742 F.2d 1156, 1160 (9th Cir. 1984)). Additionally, given the express terms of the statute, the court must also address whether the wrongs are ongoing or likely or are apt to continue. *See* 15 U.S.C. § 53(b)(1) ("Whenever the Commissioner has reason to believe – (1) that any person, partnership, or corporation *is violating, or is about to violate*, any provision of law enforced by the Federal Trade Commission, . . .") (emphasis added); *FTC v. Mktg. Response Group, Inc.*, No. 96-111-civ-T-17A, 1996 WL 420865, at *2 (M.D. Fla. June 24, 1996) (citing *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985)). The FTC, however, is not required to prove irreparable

8

harm. *FTC v. Univ. Health Ctr.*, 938 F.2d at 1218. Nor is it required to post a bond. 15 U.S.C. § 53(b).

III.

Evidence and proffered exhibits substantially supports the FTC's allegations that the Defendants, acting in concert, operated a loan modification and foreclosure relief business which relied upon deceptive and misleading direct mail solicitations and telemarketing activities in violation the FTC Act and the TSR. On the available evidence, while the business actually brought some relief to a number of consumers and on a number of occasions made refunds to consumers of at least a portion of their advance fee, the enterprise employed deceptive practices, marketing and sales techniques such that I conclude that the FTC is substantially likely to prevail on its claims as against each of the Defendants.

The proffered evidence reveals that since at least late 2008 and thereafter, Defendants Crowder Law Group, P.A., formerly Jackson, Crowder & Associates (together herein "JCA"), and their principals, officers and employees, acted in concert to conduct a purportedly legitimate and successful mortgage loan modification and foreclosure relief business staffed and run by attorneys and paralegals who promised consumers/clients that they would help save their homesteads through a loan modification program or via bankruptcy. By early 2009, Washington Data Resources, Inc. ("WDR") and Optimum Business Solutions, LLC, a/k/a Attorney Finance Services, LLC, d/b/a Attorney Financial Services (collectively, "AFS") were formed to carry on the business, with WDR performing the marketing and sales activities and AFS controlling the money side of the business. While Defendants claim to

9

have been a legitimate enterprise intent on helping consumers save their homes during these difficult economic times (and indeed, they can claim some success),[6] the proffered evidence suggests that there were many dissatisfied clients as well. Further, even in those cases where the Defendants achieved a loan modification for the client, such was accomplished through a scheme employing a deceptive business model and reliant on deceptive and misleading mass mailings[7] and telemarketing activities[8] to generate clients and profits.

---

[6]Defendants have urged that a substantial number of consumers were assisted by their efforts and that a sizable number of refunds were made. There is some evidence of legitimate business activity. For instance, one former loan processor for WDR indicates she had 20 to 35 loan modifications. *See* Walters Decl., Pl. Ex. 20. Additionally, Bishop has filed summary documents purporting to show that substantial refunds were made to consumers in 2008 and 2009. *See* (Doc. 56).

[7]Defendants mass mailed postcards to targeted consumers soliciting their further inquiries. Two examples of such mailers are proffered by the FTC. *See* Pl. Exs. 1 and 9 at 49-50. According to Defendant McDaniel, who designed the mailers and was in charge of sales at JCA/WDR, Pl. Ex. 1 was seldom used but the mailer illustrated in Pl. Ex. 9 was used 90% of the time. The mailers, ostensibly from an attorney in the consumer's area, suggest an urgency in the consumer's situation and tout a "Fresh Start Program" or "New Start Program" by which the consumer can refinance or restructure his/her existing home loan and lower the monthly payment. The mailers also suggest a tie-in with some government program. In the mailer used most often, it expressly states that the "New Start Program is a federal program designed for homeowners just like you . . . You have been selected to receive this offer to help relieve you from the burden of overdue mortgage payments, past medical and credit card debt." *Id.* The consumer is advised that he/she is "pre-qualified" and urged to call a toll-free number. As the scheme worked in practice, the mailer came from the Defendants, not the listed attorney. The toll-free number rang in at JCA/WDR at its Clearwater offices, not at the office of the attorney who signed on the mailer. Undercover calls to the toll-free number suggest the consumer was lead to believe that an attorney in his/her area would be actively involved in the loan modification process. However, as the scheme worked in practice, the attorney whose signature was on the mailer had little involvement with the consumer and no real involvement in any efforts at loan modification.

[8]Defendants staffed the toll-free lines with representatives, so-called "legal assistants" or "paralegals," to answer telephone inquiries. The FTC proffers transcripts of three undercover phone conversations. *See* Pl. Exs. 5, 6, and 7. The similarities in these calls suggests that the sales representatives employed a basic script to sell the loan modification services. In these calls, the consumer is lead to believe he/she will receive the services of

Once corporate liability is established, the FTC must show that the individual defendants participated directly in the practices or acts or had the authority to control them, and that the individual defendants had some knowledge of the practices. *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996) (quoting *Amy Travel Serv., Inc.*, 875 F.2d at 573). In opposition to the FTC's claim that he was actively involved in the operation of this loan modification business, Bishop argues that his activities were "factually and legally distinct from the FTC charges. . . ." (Doc. 32). Thus, he maintains that because of his past experience in telemarketing and his ownership of furniture, equipment and software necessary for such business, he was approached in March 2008 and asked to help set up JCA to conduct a national bankruptcy firm. In June 2008, after JCA was up and running, he ceased his hands-on work but negotiated for the right to broker the direct mail marketing program for JCA. Thereafter, he or his company received a flat fee per mail piece as compensation for his work, furniture and equipment, and software. In 2009, Defendant Crowder created WDR and AFS

---

lawyers and paralegals who are highly successful in obtaining loan modifications and that the modifications can be achieved in about sixty days from when the consumer signs up for the program, that is, when he/she pays the advance fee. The representatives claim their program has helped hundreds and thousands of homeowners nationwide. While no proffered call supports that the representatives guaranteed results or claimed to be a government program, the sales pitch clearly suggested an expertise which would help the consumer save his/her home. In at least one call, the consumer was told the New Start Program was like "the Obama" program. Consumers were never told that the attorney referral in their area would not be actively involved in negotiating any loan modification. In practice, Defendants signed up the clients, collected the money, and performed any efforts at loan modification. The outlying attorney, who agreed to allow his name to be used in advertising, merely signed off on the retainer agreement after the client was signed up and spoke with the consumer to explain the loan modification process. For this, the attorney was paid $100.00. If a modification was obtained, the attorney received another $100.00. *See* Madden Decl., Pl. Ex. 9 at 1-49. Any efforts at loan modification were made by the so-called paralegals at JCA. It appears that none of the so-called paralegals actually had any legal training. *See* Stockman Decl., Pl. Ex. 8. No modification was sought until the entire fee was paid by the consumer. *See* Walters Decl., Pl. Ex. 20.

11

to carry on the loan modification business. Crowder's wife ran AFS for a while. In February, 2009, Bishop took over management of AFS. According to Bishop, the company was not profitable and he sold it to Defendant Lewis in June 2009. Bishop denies any relationship with WDR or the design of any of the mailers it employed apart from being a third-party vendor. He also denies any financial stake in either JCA or WDR. (Doc. 32-5). In additional support, Bishop offers the affidavits of Defendant Crowder (Doc. 32-2) and Defendant McDaniel (Docs. 32-3, 32-4). McDaniel confirms that Bishop was not involved in the formation, operation, management or profits of WDR. McDaniel claims that he designed the mailers and, before sending them out for mailing, received the approval of the attorneys whose names were used.[9] After WDR was formed, a marketing agreement between WDR and Bishop's company ("Nationwide") was consummated. The agreement appears to incorporate the same terms under which Bishop had been providing the mailing services to JCA. It provided that Nationwide would provide promotion and marketing services for law firms as requested by WDR. (Doc. 43-2). It dictated that any advertising used by Nationwide to obtain new clients would be reviewed by the attorney named in the advertising before being used and would be truthful and not misleading. Nationwide also agreed to lease the computers, telephones, equipment and furniture being used by JCA to WDR. In consideration, Nationwide was paid .6857 cents per post card by WDR *Id*. As Bishop argues this, his only involvement in the end was as an innocent third-party vendor and no injunction

---

[9]In support of his opposition, Bishop also proffers several news articles and opinion pieces on the plight of homeowners in the failing economy and the failure of the government and the lenders to provide an adequate response. He requests that the court take judicial notice of the same. *See* (Docs. 32, 48). While Bishop fails to identify the particular facts he wishes judicially noticed, the requests have not been opposed by the FTC and for purposes of this motion only, the requests are granted.

12

is necessary as against him as the activities of this enterprise have wholly ceased and there is nothing more that he can do.

However, by the FTC's proffer, Bishop was an active participant in the start-up and operations of JCA and later, AFS. Such is essentially confirmed by Bishop himself. The FTC also establishes that this was not Bishop's first venture in the loan modification business, and it urges that the court cannot be assured that it will be his last. Thus, even before joining up with JCA, he and Defendant McDaniel worked with Mortgage Assistance Solutions, LLC. ("MAS"), a corporation offering the same type advanced fee rescue services for homeowners. While Bishop claims such was a highly successful and legitimate business,[10] that company was sued by the State of Illinois under its Mortgage Rescue Fraud Act in September 2007, and in March 2008 the company reached a negotiated settlement with the Attorney General of Idaho agreeing to no longer solicit foreclosure relief business in the state. *See* Pl. Ex. 19. When MAS ceased business, Bishop brought his knowledge, experience and computer-based program to JCA.[11] While Bishop counters that the original concept discussed with Jackson and Crowder was for a nationwide bankruptcy practice, not a loan modification business, loan modification became a part of the JCA portfolio by the end of 2008. Bishop maintains that he took no active part in JCA after the initial set-up but acknowledges that he negotiated the

---

[10]In his second affidavit, Bishop acknowledges that he managed MAS, "a loss mitigation business," and built a state-of-the-art back office software program. (Doc. 36-2). He minimizes the legal actions taken against MAS and asserts that although the business was highly successful, because there were too many bad actors in this line of work, he and Michael Stoller determined to close MAS in about March 2008. *Id.* Shortly thereafter, he was introduced to Jackson and Crowder. He brought to them the idea for setting up a national bankruptcy practice.

[11]Bishop's contributions to the start-up of JCA were not insignificant. Bishop himself estimates the value of his computer software package alone at $300,000.00.

13

right to broker the direct mail pieces used by them. Once JCA entered the loan modification business, the direct mail side of the business was highly similar to that used by MAS.[12] While Bishop urges the mailers he sent out had been approved by attorneys, given his experience he surely could appreciate on his own the deceptive and misleading nature of the message being sent consumers. After WDR and AFS were formed, Bishop was asked by Crowder to take over the management of AFS. In about February 2009, Bishop became a managing member of AFS with authority and control over the bank account of AFS. *See* Pl. Exs. 2, 18. Bank records demonstrate that Bishop disbursed significant sums from the AFS bank account, including sizable sums to WDR, the sales arm of JCA's loan modification business. Pl. Ex. 18. While he sold AFS in June 2009, Bishop continued to broker the direct mailings for JCA/WDR to the end.

In sum, Bishop played a significant role in the development and operations of JCA. He continued to make significant contributions after the formation of WDR and AFS. On the evidence presented, the FTC has met its burden of demonstrating a substantial likelihood of success on the merits as against him. On this finding, no showing of irreparable harm is necessary. *See FTC v. Univ. Health Ctr.*, 938 F.2d at 1218 (providing that, proof of irreparable harm is not required for FTC to obtain preliminary injunction); *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989) (providing that, because irreparable

---

[12]There is a great deal of similarity between the MAS mail solicitations and the mail pieces later used by Defendants. *Compare* Pl. Exs. 1 and 9 *with* Pl. Ex. 19 at 8. Both refer to a "Fresh Start Program " as a means to save one's home. Both employ language intended to create a sense of urgency. So similar are the mailers that the one used in Idaho by MAS bears the identical "document #" as the "document #" employed in the Defendants' mailers. These very mailers were the subject of the Illinois and Idaho enforcement actions and clearly Bishop was aware of those state's concerns with the deceptive nature of the solicitations.

14

injury is presumed in a statutory enforcement action, the district court need only find some chance of probable success on the merits).

As indicated above, no preliminary injunction may properly issue if the FTC is unable to demonstrate that the individual defendant is currently violating, or is apt to violate, any provision of law enforced by the FTC. Here, Bishop urges that because the FTC has effectively shut down the operations at JCA/WDR, there are no ongoing violations of law. He urges further that there is no threat of future violations on his part, and thus there is no need for any restraints on his future activities. I find this a close issue. The FTC's factual showing in this regard is limited. At arguments, it essentially urged that Bishop had done this type business once, done it twice, and therefore likely would do it again.

The FTC has proffered records from the Florida Division of Corporations. These documents reflect Bishop's relationship with two limited liability companies under the names of Fresh Start American Mortgage Services, LLC, and New Start Program, LLC. The filings indicate the principal office address for each was in Clearwater, Florida, at the same address as JCA's business. Pl. Ex. 19.[13]

These records also reflect Bishop's interest in a foreign, for-profit corporation which sought to do business in Florida in 2008, Nationwide Marketing and Management Services, Inc., incorporated in Delaware. He sought to use the alternative names of Nationwide Marketing and Management Services, Inc., and then Nationwide Paralegal Services, Inc., in

---

[13]These records reflect activity in 2007 even before MAS was shut down. John B. McDaniel, likely Defendant Brent McDaniel, is listed as a managing member on the New Start filings. The documents also suggest that Bishop was involved with Crowder earlier than he maintains. These entities now appear inactive.

15

Florida. Bishop again lists the business address at the same Clearwater address used by Defendants.[14] *Id.*

It further appears that in September 2009, Bishop, McDaniel and others incorporated Legal Administrative Services, Inc., a domestic for-profit company. Bishop is listed as President and Director. He also is officer and director of Worldwide Marketing Services Corp., incorporated in April 2009. *Id.* These companies, along with Nationwide, appear active, although the nature of their current business activities is unclear.

While there is no showing by the FTC of any current improper activities by Bishop, it has minimally demonstrated a reasonable likelihood that Bishop will again engage in such mass marketing activities. Bishop was an active participant in MAS when it was pursued by two states for improper activities. By his own account, the company was closed down because there were too many "bad actors" in the mortgage relief business. Despite that recognition, he again became directly involved in the same type business. Even if, as he claims, the intention of JCA was to form a national bankruptcy business, with Bishop's assistance JCA soon developed the same type mortgage relief business conducted by the bad actors. Bishop, while he denies it, has played a substantial role in both businesses. By his own account, he is an experienced "back office" operator and telemarketer. He has interest in three current corporations. Thus, while it is a close issue, I find it reasonable to conclude that

---

[14]It is not entirely clear from the records when or whether Bishop received permission to do business in Florida, but Nationwide, as he refers to it, was the entity through which he conducted the direct mail services for JCA/WDR and by his account appears to be an active business.

16

he will again employ his talents in another mass marketing activity which merits the court's attention until resolution of this suit.

Finally, the FTC has also met its burden of demonstrating that the equities weigh in favor of issuing a preliminary injunction as against Bishop. The principal equity in this regard is the public interest in protecting consumers from such mortgage foreclosure relief scams. Undoubtedly, this is a significant interest worthy of protection.

V.

Accordingly, for the reasons set forth above, it is RECOMMENDED that the FTC's request for a preliminary injunction be **GRANTED**. In particular, it is recommended that a preliminary injunction be entered as against Defendant Richard Bishop restraining his participation, either directly or indirectly, in the conduct or affairs of any loan modification or foreclosure relief business pending final resolution of this suit. It is also recommended that an asset freeze related to Bishop's property as of the date of the TRO be continued. As the FTC has agreed in stipulated agreements with other Defendants, the freeze should not extend to income or assets lawfully obtained since that date. *See, e.g.,* (Doc. 54 at 11). A continuation of the TRO insofar as it relates to the preservation and maintenance of business records is also appropriate. Finally, Bishop should be required to advise the FTC of his

current business activities and notice of any new ventures he may undertake hereafter pending resolution of the suit. *See e.g.,* (Doc. 54 at 17-18).[15]

Respectfully submitted on this<br>
7th day of December 2009.

THOMAS B. McCOUN III<br>
UNITED STATES MAGISTRATE JUDGE

**NOTICE OF EXPEDITED OBJECTION PERIOD**

Failure to file written objections to the proposed findings and recommendations contained in this report **by 12:00 p.m. (noon) on December 11, 2009**, shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; *see also* Fed. R. Civ. P. 6; M.D. Fla. R. 4.20.

Copies to:
The Honorable Steven D. Merryday, United States District Court Judge
Counsel of Record

---

[15]On December 3, 2009, the court granted Bishop the right to examine and copy certain files at the JCA offices. (Doc. 53). Bishop contends such matters will lend further support to the legitimacy of the activities of this business. The court granted Bishop leave to supplement the record in this matter if necessary and appropriate to do so after his review of the business records.