UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


FEDERAL TRADE COMMISSION,

     Plaintiff,

v.                                CASE NO.: 8:09-cv-2309-T-23TBM

WASHINGTON DATA
RESOURCES, et al.,

     Defendants.

_____/


**<u>ORDER</u>**

     Alleging violations of Section 5 of the Federal Trade Commission Act

("FTC Act"), 15 U.S.C. §§ 45(a), and the Telemarketing Sales Rule, 16 C.F.R. Part

310, the Federal Trade Commission sues (Doc. 1) three corporate defendants and six

individual defendants. Each of the nine defendants engaged in the marketing and sale

of mortgage loan modification services. The FTC seeks both an injunction and a

money judgment.

     A bench trial, during which the FTC presented evidence of alleged deceptive

trade practices, commenced on October 3, 2011, and ended on October 11, 2011.

Before the trial, a consent judgment (Docs. 296, 424) was entered against the

defendants Crowder Law Group, PA; Optimum Business Solutions, LLC; Bruce

Meltzer; Kathleen Lewis; and Douglas Crowder. The Clerk entered a default (Doc. 202) against the defunct defendant Washington Data Resources, Inc. The defendants Richard Bishop, John Brent McDaniel, and Tyna Caldwell stood trial.[1]

Each entity central to this action, despite shifts in the name, the organization, the personnel, and even in the products and services sold, functioned as a contributing component of a comprehensive and continuing enterprise ("the Enterprise") controlled historically by Richard Bishop and Brent McDaniel. On the one hand, consisting of a law firm, an administrative services company, a marketing company, a payment collector, and an employee leasing company and, on the other hand, employing a collection of attorneys, salesmen, administrative assistants, and businessmen, the Enterprise solicited financially distressed homeowners and offered the prospect of relief through either a loan modification or a bankruptcy.

The Enterprise's loan modification "program" operated in accord with an established template that unfolded as follows: The marketing company, Nationwide Marketing, contracted with a third-party direct-mailing company, Genesis Direct, which sent an oversized postcard to a homeowner with a mortgage payment at least two months in arrears. Each postcard offered financial relief to the homeowner and displayed prominently both a toll-free telephone number and the signature of an attorney who was local to the homeowner. When the homeowner called the toll-free

---

[1] Since September 10, 2010, Caldwell has proceeded *pro se*. (Doc. 189) Since May 12, 2011, McDaniel has proceeded *pro se*. (Doc. 354)

telephone number a salesperson at the administrative services company, "Jackson Crowder" or "Washington Data Resources," (collectively "Fresh Start")[2] answered in Clearwater, Florida; read a sales script; and collected financial information to determine whether the homeowner "qualified" for a Fresh Start "program," that is, assistance with either a loan modification or a bankruptcy. If the "program" interested the homeowner, the salesperson obtained payment information, established a payment plan, and sent the homeowner an enrollment package that consisted of an attorney retainer agreement. The homeowner paid for the service by establishing a payment plan at the initial contact with the salesperson. The homeowner paid the Enterprise payment processor, Attorney Finance Services ("AFS"), which collected, processed, and disbursed the payment among the Enterprise. When the homeowner returned the enrollment package to Fresh Start, a customer service representative in Clearwater, Florida, often introduced to the customer as a "legal assistant" or "paralegal," reviewed the documents for completeness, forwarded the retainer agreement to the designated "outlying" attorney, and telephoned the client about the status of the application. The outlying attorney received $100 for each retainer agreement the outlying attorney signed. The

---

[2] Because Jackson Crowder and Washington Data Resources operated with little, if any, separate corporate identity, the one is often impossible to distinguish from the other. Witnesses, attorneys, and parties often refer collectively and confusingly to the two companies as either "Jackson Crowder" or "Washington Data Resources." Instead of referring to the consortium with a company's name (which is better reserved to identify the company itself), this order entitles the consortium "Fresh Start," which is the name often used in the postcards to identify the sender.

attorney sometimes called the homeowner and explained the loan modification procedure. The customer service representative communicated with the homeowner, gathered lender-required financial documents (such as weekly pay stubs and tax returns) from the homeowner, and submitted the required documents to the lender.

Neither the customer service representative nor the outlying attorney nor Fresh Start nor the Enterprise controlled whether a homeowner obtained a loan modification, a result that was entirely within the discretion of the lender. Collecting documents and negotiating with the lender, the Enterprise served as an intermediary only. Once the lender decided whether to grant a loan modification, Fresh Start conveyed the terms to the attorney, and the attorney usually called the homeowner to explain. The homeowner ultimately decided whether to accept the loan modification.

The FTC alleges that the defendants violated the FTC Act, 15 U.S.C. § 45(a), both (1) by misleading homeowners into the mistaken belief that the defendants "in all or virtually all instances" can reduce mortgage payments and (2) by misleading homeowners into the mistaken belief that the defendants "were an agency of, or affiliated with," the United States government. Additionally, the FTC alleges that the defendants violated the Telemarketing Sales Rule by deceptively overstating both the efficacy of the service and the involvement of the attorney and by deceptively claiming Fresh Start was affiliated with the United States government.

# I. THE HISTORY, STRUCTURE, AND CONTROL OF THE ENTERPRISE

The defendants Richard Bishop and Brent McDaniel first met in February, 1984, when McDaniel became a sales manager at a California "solar company" owned and operated by Bishop. Throughout the eighties and nineties, the pair opened and operated a collection of small businesses. After a few years apart in the early 2000's, Bishop contacted McDaniel in 2004 about the prospect of starting a "loss mitigation" company, an operation designed to secure debt relief, including a loan modification, refinancing, or a bankruptcy, for a financially distressed homeowner. (Tr. Oct. 5, 2011, at 187-89)

In August, 2004, after attending a loss mitigation training in Virginia, Bishop, McDaniel, and Michael Stoller established Mortgage Assistance Solutions ("MAS"), a "loss mitigation" company and the precursor to the corporate defendants in this action. A sharing arrangement entitled Bishop to 50%, McDaniel to 30%, and Stoller to 20% of MAS's profit. McDaniel managed sales and marketing, and Stoller, an attorney, handled "all the legal aspects" of the operation. Bishop managed the company's "fulfillment" or "day-to-day" or "back-end" operation and was eventually aided in 2006 by the future "Senior Vice-President of Operations," defendant Tyna Caldwell. (Tr. Oct. 5, 2011, at 189-90; PX 289, at 147)[3]

---

[3] On the second day of trial, October 4, 2011, the FTC and each defendant stipulated into evidence Plaintiff's Exhibits ("PX") 1-3, 5-7, 9, 18, 19, 23, 29, 30-32, 102-11, 113-16, 118-36, 138- 53, 155-59, 161-97, 199-209, 211-216, 218-24, 226-63, and 265-307. (Tr. Oct. 4, 2011, at 9-15) The
(continued...)

Seeking direct-mail advertisement, Bishop and McDaniel hired Rodael Direct, Inc. (d/b/a Genesis Direct) ("Genesis"). Bishop and McDaniel asked Genesis to create and mail commercial postcards designed to generate telephone calls from prospective customers. Genesis contracted with Nationwide Marketing, a shell corporation owned by Bishop. The contract between Genesis and Nationwide Marketing continued throughout the operation of the Enterprise. (Tr. Oct. 4, 2011, at 137-140, 142)

According to McDaniel's testimony, many disreputable "loss mitigation" companies emerged when the foreclosure crisis began in 2006 and attracted the attention of several government agencies. In early 2007, Stoller received from the government of Illinois a letter informing MAS of a new Illinois law prohibiting a "loss mitigation" company's collecting a fee "up front," that is, collecting a fee before obtaining debt relief for the homeowner. The law exempted an attorney. Reasoning that MAS fell within the attorney exemption, Stoller ignored the letter, and MAS continued to collect a fee "up front." Illinois filed suit against MAS. After a $45,000 settlement, MAS closed in late 2007. After MAS's closure, Bishop, McDaniel, and Stoller briefly operated the Stoller Law Firm, solely a bankruptcy firm. After a

---

[3](...continued)

stipulation contains otherwise inadmissible FTC investigator declarations, witness depositions, and other documents probably objectionable under the Federal Rules of Evidence and the Federal Rules of Civil Procedure. With reservation and reluctance, the evidence was received. The bulky "document dump" (preferred only by an unskilled or unprepared or overwhelmed lawyer) is a disfavored (and risky) practice that almost always results in grief for the lawyers or the judge or for anyone else left to swim in a great reservoir of undifferentiated and unfamiliar paper.

business disagreement, Bishop and McDaniel separated from Stoller. (Tr. Oct. 5, 2011, at 190-91)

Seeking to mass-produce homeowner bankruptcy services with the assistance of an attorney in several states, Bishop and McDaniel in a March, 2008, meeting pitched the idea to Jim Jackson and Douglas Crowder, each a California bankruptcy attorney. On March 11, 2008, the group formed Jackson, Crowder, and Associates ("Jackson Crowder"), which began representing homeowners in bankruptcy;[4] the firm contracted with Nationwide Marketing to create (through Genesis) direct-mail advertisement, answered the initial telephone call from a potential customer, and assigned an outlying Jackson Crowder attorney to each interested homeowner. (Tr. Oct. 5, 2011, at 190-92; PX 289, at 51)

Along with several employees from MAS and the Stoller firm, Caldwell joined Jackson Crowder. Managing nearly thirty employees, Caldwell continued to oversee the operation division. Although never hiring or firing an employee without approval from McDaniel or Bishop, Caldwell interviewed potential employees and recommended hires to McDaniel. (Tr. Oct. 6, 2011, at 174, 210-12; PX 292, at 11-14; PX 289, at 49)

---

[4] Jackson Crowder changed names to "Crowder Law Group" upon the departure of Jackson and to "Meltzer Law Group" upon sale to Bruce Meltzer. The name distinction is immaterial, and the entity is entitled "Jackson Crowder" throughout this Order.

In October, 2008, Crowder approached McDaniel about a bill recently passed by the United States House of Representatives. Designed to give a bankruptcy judge the power to "cram down" an underwater mortgage principal to the market value of the home, the bill required as a condition precedent that each homeowner attempt to obtain a loan modification. Recognizing the opportunity for lucrative business expansion, Crowder and McDaniel restructured Jackson Crowder to offer a qualified homeowner either a loan modification or a bankruptcy. The bill later died in the Senate. Nonetheless, in late 2008 Crowder started Washington Data Resources, Inc., ("Washington Data") to mass-produce loan modifications. Directly managing sales and marketing, McDaniel served as President of Washington Data; directly managing operations, Caldwell served as "Senior Vice-President of Operations" or "Director of Operations." (Tr. Oct. 3, 2011, at 173; Tr. Oct. 5, 2011, at 194; PX 9, at 35)

No distinct corporate demarcation appears between Washington Data and Jackson Crowder. Crowder explains his view of the relation between Jackson Crowder and Washington Data:

> Q. And it would be your contention that after that after [January 5, 2009,] that any clients who came in were loan [modification] clients through Washington Data Resources?
>
> A. No. Washington Data Resources never had any clients. It was not a law firm. It couldn't have clients. Scratch that. The clients that Washington Data Resources had would be the attorneys that hired Washington Data Resources.

(PX 307, at 74) However, the hiring of Washington Data by outlying attorneys was a formality only. Washington Data recruited the outlying attorneys, Washington Data paid the outlying attorneys, Washington Data dictated to the outlying attorneys the terms of the client representation, and Washington Data decided when to grant a refund to an unsatisfied homeowner. (Tr. Oct. 11, 2011, at 6-7, 28; PX 293, at 24-25; PX 298, at 42-44)

Sometime after Washington Data's founding, McDaniel negotiated a compensation agreement with Crowder. As the sole officer of Washington Data, McDaniel felt entitled to a 50% share of the profit. An undated memorandum drafted by McDaniel entitled "JBM Counterpoints on Proposed WDR Agreement" (PX 320) explains:

> First and foremost, I believe since I will be responsible for any potential problems arising from the operation of [Washington Data] that the compensation should be as follows. 50 percent of potential profits to [McDaniel]. In April or May when Jim Jackson left the [Jackson Crowder] law firm he left because he did not want to risk his license for any potential wrongdoing or problems. Now DAC is leaving for similar or the same concerns and I believe 50% is very fair compensation for being solely responsible for the day-to-day operations as well as the legality of [Washington Data].

Nonetheless, McDaniel received 40% of the profit, and Crowder received 60% of the profit. (Oct. 5, 2011, TR at 254-57)

With the addition of Washington Data, Fresh Start began mass-producing loan modification services, labeled as either "the New Start Program" or the "Fresh Start

Program." Nominally through Nationwide Marketing, Bishop and McDaniel continued to manufacture the direct-mail postcards with assistance from Genesis. The sales team continued to answer initial telephone calls from potential customers and assign outlying attorneys to registered homeowners. Fresh Start posted advertisements on "Craigslist.org" in each targeted state to recruit outlying attorneys able to represent local homeowners. Depending on a homeowner's financial position, a homeowner might "cross over" either from a bankruptcy to a loan modification or from a loan modification to a bankruptcy. (Tr. Oct. 5, 2011, at 194; Tr. Oct. 11, 2011, at 6-7)

Although formally leaving Jackson Crowder in June, 2008, Bishop, the founder and manager of MAS, maintained an obscure but authoritative presence in the Enterprise. First, Bishop owned the furniture, the computers, the telephones, and the computer database used by Fresh Start. Bishop estimated at $300,000 the value of the database. According to Crowder, with McDaniel's assistance Bishop provided "consulting" for the Company. Crowder felt that, if McDaniel were terminated, Bishop would remove the equipment and the marketing services from the Company. With the removal of the equipment and the database, Crowder "wouldn't have wanted to keep running [Jackson Crowder]." (PX 307, at 52-53) (PX 289, 50; PX 307, at 23-24, 51-52, 108)

Second, beginning in March, 2009, Bishop owned AFS, and through AFS Bishop controlled the Enterprise's finances. AFS collected payments from each

homeowner and disbursed the money to Jackson Crowder, Washington Data, Nationwide Marketing, each "outlying attorney," and each homeowner receiving a refund. Bishop managed Kathleen Lewis, the bookkeeper for AFS. On July 25, 2009, Bishop transferred to Lewis ownership of AFS for no cost. In a deposition stipulated into evidence, Lewis testifies, "[Bishop] didn't want to be a part of Crowder Law; I think he wasn't happy with it, or whatever, but he didn't want to be connected with it, in any way. And, of course, [AFS] was very much involved in it, and he wanted to get rid of it." (PX 295, at 44) When asked how AFS profited, Lewis responded:

> The way it made money was just that it received income from all the clients that it billed, and, so, whatever money was left in that account, if want [sic] to transfer and leave 5,000 in there. And if I wanted to take money out of there for my salary, I could probably increase my salary. I think I did increase my salary a $100 -- well, really, $50 a week, because it was $100 per pay period, and [Bishop] knew I had done that. But that's the only benefit, I guess, and that was less than four months that that happened, because that was then, started in August.

(PX 295, at 45) Despite the transfer, Bishop continued through Lewis to monitor the Enterprise's finances. (PX 289, at 74-75,77; PX 295, at 16-18; PX 297, at 88; PX 307, at 71)

Additionally, Bishop owned Nationwide Marketing, which continued to contract with Genesis, which billed Nationwide Marketing 10.6¢ per postcard. Nationwide Marketing billed Fresh Start a premium price of 68.57¢ per postcard. In a deposition stipulated into evidence, Bishop testifies that, because Jackson Crowder was a law firm, a non-attorney could not receive a share of the profit. Thus, Bishop

claims that Nationwide Marketing allowed Jackson Crowder to pay Bishop for his establishing Jackson Crowder and for his letting the equipment. Crowder disagrees, "[m]y understanding was that the purpose of the agreement [with Nationwide Marketing] was just what it said it was, basically to pay [Bishop] for doing the marketing." (PX 307, at 38) However, through McDaniel, AFS, and Lewis, Bishop ultimately decided how much Jackson Crowder paid Nationwide Marketing. Solely owned by Bishop and serving only one client, Nationwide Marketing had no other officer or director and no member or employee. (Tr. Oct. 4, 2011, at 153; PX 149; PX 289, at 50-51, 68; PX 295, at 19-21; PX 307 64-65)

Just before Crowder sold Jackson Crowder to outlying attorney Bruce Meltzer, the billing arrangement changed. Unknown at first to Meltzer, a July 29, 2009, agreement between Nationwide Marketing and Genesis required Genesis to charge Jackson Crowder 38.6¢ per postcard, and required Genesis to kick-back 27¢ per postcard to Nationwide Marketing. Genesis would keep 11.6¢ per postcard, a 1¢ per postcard increase from the previous arrangement. Having previously contracted with Bishop and McDaniel when creating postcards for MAS and Jackson Crowder, Genesis trusted McDaniel's statement that Jackson Crowder agreed to the new arrangement. Brent Comar, Genesis's Vice-President of Sales, stated, "McDaniel advised that no formal letter was sent to Jackson Crowder advising of the billing company change and stated that they were fully aware and Genesis should move forward with invoicing them directly." (Tr. Oct. 4, 2011, at 168) (PX 17) However,

Meltzer, Caldwell, and Dillon during an October, 2009, meeting[5] with Genesis asked why the billing rate more than tripled. Allegedly because of a confidentiality restriction in the contract with Nationwide Marketing, Comar remained silent. Comar telephoned Bishop and McDaniel for permission to discuss the arrangement with the Jackson Crowder team; Bishop and McDaniel refused. Instead, McDaniel advised that the invoice to Jackson Crowder should be dropped to 20¢. Testimony from Comar explains the controversy:

> Q.  And how did you – how did you feel about that suggestion?
>
> A.  Same issue, how do I justify this, between 11.6 cents and, whatever that is, 17.6 cents? So 18 – same issue. I need something to say here's what they do, here's what we do, here's why it's more money.
>
> Q.  How did you ultimately decide to resolve the situation?
>
> A.  We – without getting anything back from [Bishop] and [McDaniel] that I could go with or talk to them about, all the invoices that Crowder had at that time and had not paid we reduced the price back to what [Jackson Crowder] thought they should be paying.
>
> And one thing I should clarify, too. What they were paying before, which is the part I never did quite understand, because our assumption was we were paying Nationwide and then Nationwide was billing whoever they billed 38.6 cents. So at the end of the day I thought what was happening is we were taking that invoice, taking all their services that go between the 11.6 cents and 38.6 cents, putting all that on a Genesis invoice with the client's knowledge and everybody understood that.

---

[5] A month before the meeting, Meltzer terminated McDaniel from Fresh Start.

> So the only thing that I could effect, then, were the things that Crowder had and had not paid yet and all the work that was in process and all the work going forward. So we credited all of that and re-worked the pricing down to the original fee, but there was nothing I could do about the $60,000 in commissions that had already been paid to [Bishop] and [McDaniel].

(Tr. Oct. 4, 2011, at 176-77) (Tr. Oct. 4, 2011, at 163, 168-69, 170-74; PX 14; PX 184; Bishop Exh., at 5)

Also, Bishop owned RABC, a company that leased the most valuable employees to Fresh Start. The employees McDaniel, Caldwell, Lewis, and John Johnson received health insurance benefits through RABC, which billed Fresh Start $900 to $1,000 per month, a price commensurate with the cost of Bishop's monthly health insurance premium. In the spring of 2009, Bishop closed RABC and transferred the employees to TABC, an identical business owned by Caldwell. Ensuring that Bishop's family continued to receive health insurance, Caldwell placed Bishop's wife on the payroll. Caldwell also added Chris Dillon to the employees leased by TABC. (Tr. Oct. 6, 2011, at 195-96; PX 289, at 52-53, 82-85, 130-33)

In April, 2009, responding to a telephone call from Caldwell, outlying attorney Bruce Meltzer traveled to Clearwater:

> Q.   You knew of [Tyna] Caldwell and Doug Crowder; what happened in that trip?
>
> A.   Well, really, you know, I got down, I guess, expecting to see the operation, and meet with [Tyna], and everybody. And it really turned out to be Brent [McDaniel], kind of, took over. You know, I quickly realized that he was, you know, at least, internally, in the office there, he was the ultimate authority.

He was the person that everybody was referring to, I guess, as my boss, or – and, so, he, basically, took it over. And took me out to dinner and, you know, told me that they, basically, were not happy with Doug [Crowder] running the company, and they were looking for another attorney to take it over.

(PX 298, at 55) In early August, 2009, Bruce Meltzer bought Jackson Crowder from Crowder for one dollar, which Crowder never received:

Q. So why did you sell Jackson Crowder to Bruce Meltzer?

A. Essentially what I found out was that a lot of the enrollment people working for [Washington Data] were actually employees of Jackson Crowder and the telemarketing license was still in the name of Jackson Crowder rather than Washington Data Resources. And I found this out when the Florida – some Florida department came in and closed the company down for not having a valid telemarketing license.

And at that point I said to [Bishop] and [McDaniel] "I don't want anything more to do with this. We should just close it down immediately."

And [Bishop] said or [McDaniel] said, one of the two, "No. We got Bruce Meltzer and Bruce is willing to buy Crowder Law Corporation" or whatever – no. Crowder Law Group. Bruce is willing to buy it. He'll buy it and then he'll get the telemarketing license and then he'll change the name of it, something like that. And so that's essentially why I sold it to Meltzer.

(PX 307, at 94)

Meltzer immediately began to change Jackson Crowder. After changing the name to Meltzer Law Group, Meltzer terminated McDaniel's access to Fresh Start's financial reports. First, however, Meltzer sought approval from Bishop, who "was the one who was the brains behind it . . . . You know, Brent [McDaniel] was more, I

hate to say the muscle . . . Rick [Bishop] was the brains, Brent was the brawn . . . . [N]othing was done . . . to Brent without Rick's input, knowledge, approval." (PX 298, at 65) In response, Bishop threatened to remove the furniture, the computers, and the database, equipment that Meltzer believed the former Jackson Crowder owned. Finally, citing trust issues, Meltzer terminated McDaniel, and McDaniel agreed to a severance. The severance granted McDaniel a continuation of salary and health insurance for three months and granted Bishop a continuation of health insurance for six months. (PX 298, at 64-71)

The Enterprise continued with Fresh Start leasing the equipment from Bishop (until November, 2009) and with Bishop and McDaniel secretly receiving kick-backs through Nationwide Marketing (until October, 2009). About a month after McDaniel's September 7, 2009, termination, Meltzer learned that Bishop and McDaniel violated the severance by "poaching" employees for a new, identical venture, Legal Admin Services, which Bishop created to assist New Horizon Law Center, another venture owned by Bishop. Legal Admin Services was designed to assist New Horizon Law Center in the same manner Washington Data assisted Jackson Crowder. Meltzer terminated the severance agreement. (PX 298, at 64-71)

With McDaniel terminated and Meltzer unfamiliar with Fresh Start's sales and operations, Caldwell, the veteran manager and the newly-coined "General Manager," became Meltzer's "right-hand person" and reported directly to Meltzer. (Tr. Oct. 6, 2011, at 212-13) Caldwell assumed functional responsibility over Fresh

Start, including both the sales division and the operations division, and began to monitor the flow of money throughout the Enterprise. Lewis began sending to Caldwell and Meltzer a periodic "on/off report," a financial report that tracked homeowner checks payable to Fresh Start but returned for insufficient funds. Before Meltzer bought Jackson Crowder, only Crowder, Bishop, and McDaniel received the report. On the recommendation of Caldwell, Meltzer hired Jon Phillips, an experienced sales manager from MAS, to replace McDaniel as sales manager. Phillips reported to Caldwell. (Tr. Oct. 5, 2011, at 115-16; Oct. 6, 2011, at 212-14; PX 238; PX 292, at 14-15; PX 295, at 41-43, 91-92, 94)

On November 13, 2009, a temporary restraining order ("TRO") (Doc. 19) was entered against each defendant. The TRO effectively closed the Enterprise.

## II.  THE POSTCARDS

Although minimally revised throughout the operation of the Enterprise, each postcard is nearly identical. Off-white with red and black accent and approximately 8.5" x 6.5," the postcard sent to FTC consumer witness Linda Starcher provides an example. (PX 309)[6] Text appears on the front and the back. Appearing on the front left, the caption "Attention Homeowner" provides in black font a statement purportedly from an attorney who was local to the homeowner:

---

[6] The sample postcard (PX 309) is attached to this order as Appendix A. Sent by the New Horizon Law Center, the sample is substantively identical as each postcard submitted into evidence. PX1, PX 192, PX 193, PX 285, PX 286, PX 308, PX 309, PX 310, Bishop Exh. 66, and Bishop Exh. 67.

The NEW START PROGRAM is a federal program designed for homeowners just like you who may have fallen behind on their mortgage. You have been selected to receive this offer to help relieve you from the burden of overdue mortgage payments, past medical and credit card debt.

**To take advantage of this offer you should call immediately 1-866-623-5315.**

Call now to learn how we can help you discharge your debt and relieve you of annoying phone calls and sleepless nights.

[red] THIS OFFER WILL NOT BE REPEATED. CALL NOW! [/red]

Sincerely,

[Outlying Attorney Signature]
[Outlying Attorney Name]
Attorney at Law.

Fresh Start's toll-free telephone number, "CALL NOW 1-866-623-5315," appears again in smaller font below the attorney's signature. In black font at the bottom, the postcard includes a copyright and two disclaimers:

Copyright © 2009 All Rights Reserved. Printed in USA.

Please disregard if you have received this notice in error, public records are sometimes inaccurate.

Some of our clients are assisted persons under the Federal bankruptcy Code. An "assisted person" means any person whose debts consist primarily of consumer debts and the value whose non-exempt property is less than $164,250. If you are an assisted person, we are a debt relief agency and we may help assisted person's [sic] file for bankruptcy relief under the Federal bankruptcy Code. This is a solicitation for legal services.

Midway up the right side of the front of the postcard, a 1.5" x 1" red box with white font reads:

CALL IMMEDIATELY
# 1-866-623-5315
Daily 9AM to 10PM EST
Saturday 12PM to 5PM EST
Se Habla Español

Finally, the statement "PRE-QUALIFIED" appears prominently above the box in red font.

On the back side, the postcard lists the return recipient as "NEW START PROGRAM," with a return address from the same state as the solicited homeowner. Below the return address in a 3" x 3" black and red box a warning appears in white font:

THIS MAY BE YOUR
FINAL NOTICE
You may qualify for assistance
that will enable you to pay
the total amount due
to your mortgage company.
Call Immediately
1-866-623-5315

In a one-column, three-row box to the right, the postcard includes "Date of Record," "Document #," and the recipient's county. "Case #" appears below the box and directly above the recipient's home address.

According to McDaniel, "Date of Record" is the day that Genesis mailed the postcard, "Document #" has no meaning, and "Case #" is an identifying number specific to each homeowner. Genesis created each case number and Fresh Start uploaded each number into the database. When a homeowner called the toll-free

number, an Enterprise salesperson entered the case number into the database, which loaded the homeowner's initial information. (Tr. Oct 5, 2011, at 196-97)

### III.  THE OPERATION OF THE ENTERPRISE

Once a homeowner called the toll-free telephone number, a Fresh Start salesperson answered and read a sales script. The FTC offered a script identified on the cover page as "BK Pilot" (PX 231). BK Pilot pages two through five are identical to the first four pages of a script obtained from McDaniel in a request for admission (the "RFA script") (PX 322). The script instructs the salesperson to obtain financial information from the homeowner and to compute the surplus income of the homeowner. After the computation but despite the result, the salesperson pitched the "program":

> Based on the information you have provided so far, it looks like you will be able to qualify for the New Start program! I see that you have a surplus income of $____. This means after all of your bills including your mortgage are paid this is the amount of money you have left over. Based on that information you qualify for the New Start Work Out Program. What this means is that we will not only negotiate with your lender to get your mortgage brought back to current, but it will be scheduled in a way that you will actually be able to afford your mortgage payment. This is all done through negotiating with your lender using your current income and budget. As we both know the bank has their collections dept. and attorneys representing them but who is representing you? That's where we come in. We have been working with lenders nationwide helping hundreds and thousands of homeowners just like you get their finances back on track. The best part about the New Start Work Out Program is that you will have a mortgage payment with a fixed interest rate that fits within your current budget. GREAT PROGRAM WOULDN'T YOU AGREE?

(PX 231, at 3; PX 322, at 2) (emphasis in original) Telephone calls recorded by FTC

investigators on September 28, 2009, (PX 6) (the "Kraus transcript") and October 1,

2009, (PX 5) (the "Jablonski transcript") confirm Fresh Start's use of the script.

Stipulated into evidence, the transcript of each telephone call reveals a sales pitch

identical to both the BK Pilot script and the RFA script.

After pitching the "program," the salesperson "proceed[ed] to close" and

informed the homeowner:

> Now the fee for your program is $2000. This will give you our law
> firm as representation and allows you to have any creditor; or
> even their attorneys contact YOUR representation [sic] instead of
> harassing you and your family at home or even worse at your job.
> It usually takes 60 days for your lender to review and approve
> your plan from the time you have sent back the retainer
> agreement and paid the retainer fees. This will give you a chance
> to get your finances back on track and allow you to start saving
> money. I am a Legal Assistant but I am not an Attorney, so I
> need to run your file over to the paralegal and have them double-
> check my work.

(PX 5, at 23-24, 28-29; PX 6, at 28-29; PX 231, at 5) The "paralegal" either approved

the homeowner for the loan modification "program" or suggested the homeowner

file for bankruptcy or rejected the homeowner as a client. If the "paralegal" accepted

the homeowner, the salesperson returned to the telephone to collect payment

information, to establish a payment plan, and to emphasize the importance of

returning the retainer agreement. After congratulations, the salesperson transferred

the homeowner to "verification" and faxed or e-mailed the retainer agreement to the

homeowner. (PX 5, PX 6, PX 231, PX 322)

Governing the terms of the outlying attorney's representation of the homeowner, the retainer agreement, entitled "Application for Legal Services," identifies the responsible outlying attorney, that is, the local attorney representing the homeowner. In the first sentence, the agreement lists both the homeowner's name as "Client" and the outlying attorney as "Law Firm." Two paragraphs on the first page contain in standard text two disclaimers and a brief description of the service provided by the Enterprise:

> 1. CLIENT'S GOAL. Client has informed Law Firm that Client's major goal is to continue ownership of Client's real property, and to prevent a foreclosure sale upon the property by one or more secured lenders. Client understands that there is no guarantee that Law Firm can accomplish this goal for Client, but Law Firm will exercise its best efforts to do so, through the following means and for the fees below described.
>
> 2. WORKOUT SERVICES AND FEE. Law Firm will contact Client's primary and secondary mortgage holders in an effort to reduce monthly mortgage payments through the most appropriate means, such as modification of terms, reduction of interest or restructuring of loans. Law Firm's fee for this will be $2,000. This fee is earned as soon as Law Firm has initiated its first contact to any lender, whether by mail, phone, email or fax, and is non-refundable after that point. Client understands that there can be NO GUARANTEE that Law Firm will be able to negotiate any more favorable terms for Client.

(PX 127, at 13) (emphasis in original) Additionally, the agreement reminds the homeowner that "[i]n order to avoid any complications in the process, Client agrees to call Law Firm, rather than Lenders, to obtain the status of the case or other information needed." (PX 127, at 14)

If the client returned the retainer agreement and paid an installment, Fresh Start sent the retainer agreement, the homeowner financial statement, and a "mortgage authorization" to the outlying attorney for acceptance. The defendants assert that the attorneys were obligated to review the homeowner's financial information and interview the homeowner. However, evidence from both consumers and attorneys confirms that some attorneys failed to interview each assigned homeowner or to scrutinize each homeowner's financial information and other attorneys failed to interview any homeowner and failed to scrutinize any homeowner's financial information. For each acceptance, the Enterprise paid the attorney $100. (Tr. Oct 3, 2011, at 82, 85-86, 124, 161, 181; Tr. Oct. 4, 2011, at 34; Tr. Oct. 6, 2011, at 32; Tr. Oct. 11, 2011, at 28; PX 287, at 9, 24; PX 288, at 6, 9; PX 293, at 10-12; PX 298, at 26; PX 299, at 12-13; PX 303, at 17-18; PX 304, at 21-22, 41-42)

Overseeing the remainder of the loan modification service, a Fresh Start customer service representative in Clearwater, Florida, welcomed the homeowner with a telephone call to verify mutual contact information and to schedule a second financial interview. The customer service representative faxed or e-mailed the homeowner a checklist containing the documents required by the homeowner's lender. During the remainder of the service, the customer service representative, managed by a supervisor reporting to Caldwell in the operations division, was assigned to receive client documents, monitor client documents for compliance,

update homeowner status in the database, contact the lender for status updates, and update the client on the progress. The customer service representative was introduced as "legal support," "paralegal," "legal assistant," or "customer service representative." (Tr. Oct. 4, 2011, at 73-75; Tr. Oct. 5, 2011, at 48-51; PX 315; Bishop Ex. 97)

Credible testimony of Enterprise customer service representatives Dino Duda, Christopher Dillon, and Jeremiah Johnston reveals a frustrating loan modification procedure.[7] Homeowners were often unreachable, unreliable, and unresponsive; often failed to return the proper documents, such as pay stubs, tax returns, and utility bills; and often failed to provide accurate estimates to the salesperson and the customer service representative. Additionally, a burgeoning demand for loan modification in 2008 and 2009 caused a concomitant delay from lenders. Lenders often lost documents sent by Fresh Start. (Tr. Oct. 5, 2011, at 20-24, 30-31, 41-45, 58-59, 142-43; Tr. Oct. 6, 2011, at 108, 110-11 Tr. Oct. 11, 2011, 20-21)

Between the attorney's acceptance of a client and the lender's approval of a loan modification, most outlying attorneys had very little, if any, contact with the lender or the homeowner. The customer service representative contacted the lender and accomplished "all the work." (PX 294, at 22-23) An attorney's contact with the homeowner usually occurred only when the homeowner complained, *e.g.*, Fresh Start

---

[7] Although facing hurdles such as unreliable homeowners, overburdened lenders, and unconcerned upper-management, supervisors like Dillon and customer service representatives like Johnston labored admirably on behalf of the homeowner.

failed to communicate with the homeowner, the homeowner's property entered foreclosure, or the homeowner sought a refund. Defense witness and customer service representative Jeremiah Johnston testified that Fresh Start directed each customer service representative to refer to a supervisor a homeowner that sought an attorney's telephone number. Likewise, absent approval from Bill Foster, who was Fresh Start's liaison with the outlying attorneys, no outlying attorney should contact a customer service representative, and no customer service representative should contact an outlying attorney. Fresh Start's homeowner database, containing notes and updates entered by the assigned customer service representative, was accessible only internally; an outlying attorney needed to request client notes and client updates from Foster. As McDaniel admits, absent an extraordinary circumstance, the attorneys lacked a direct role in negotiation with the lender:

> THE COURT: After accepting – quote, accepting, unquote, the client, are you aware that – of whether the lawyers played any role in determining or negotiating the terms of the plan?
>
> DEFENDANT MCDANIEL: Yes, sir, I do know of instances that that did occur.
>
> THE COURT: Would you say more than ten?
>
> DEFENDANT MCDANIEL: Yes, sir.
>
> THE COURT: [Customer service representative Jeremiah] Johnston, for example, was not negotiating the terms of a – was he, the plan with a lender?
>
> DEFENDANT MCDANIEL: Yes, sir. It depended upon the situation. . . . The attorney could be consulted as well. If it came back unfavorable, we would try to negotiate with the

lender, and as I said, there were definitely instances where attorneys needed to assist.

. . .

THE COURT:    There were times when the counsel assisted the representative in negotiating with the lender –

DEFENDANT MCDANIEL:    Yes, sir.

THE COURT:    – in the process of procuring a mortgage plan?

DEFENDANT MCDANIEL:    Yes, sir.

THE COURT:    I take it there were instances where the lawyer did not participate?

DEFENDANT MCDANIEL:    In the negotiation?

THE COURT:    Yes.

DEFENDANT MCDANIEL:    Yes, sir.

THE COURT:    And those were handled by the representative with – on behalf of the client and with the representative of the lender?

DEFENDANT MCDANIEL:    Yes, sir.

THE COURT:    And the question as to whether the plan offered by the lender was – well, the question of evaluating its value, determining whether that value was sufficient, determining whether to recommend it to the client, that was the job of the representative?

DEFENDANT MCDANIEL:    Yes, sir.

. . .

THE COURT:    Who decided, in the case of an individual client's loan modification or mortgage modification whether some issue required participation by counsel?

DEFENDANT MCDANIEL:    To be honest, Your Honor, I wasn't working on that side of the organization on a day-to-day basis. We met every morning and went over the

statistics of the area and I'm not exactly sure, it might have
been Ms. Caldwell, it might have been Mr. Dillon.

THE COURT:    Safe to say it wasn't counsel himself, because
that would have been a constant series of –

DEFENDANT MCDANIEL:    Yes, sir.

THE COURT:    – consultations with counsel?

DEFENDANT MCDANIEL:    You are correct.

(Tr. Oct. 6, 2011, at 25-28) (Tr. Oct. 5, 2011, at 53-55; Tr. Oct. 6, 2011, at 27-28, 108,

110-11; PX 288, at 6-7, 36; PX 293, at 12, 54-55; PX 294, at 22-23; PX 296, at 29-30;

PX 298, at 27)

Because of the lack of client contact and the opaque directions from Fresh

Start, some outlying attorneys believed that homeowners were not "clients" (in the

legal sense of the term). Outlying attorney Gary Barsegian believed he accepted

homeowners into the "program" for an unspecified and unknown law firm. Until

Fresh Start's closure in November, 2009, outlying attorney Jim Kutkowski believed

that homeowners accepted into the "program" were not his "clients." Citing

concerns about the legality of the operation, outlying attorney Waverley Madden

"quit." In response, Fresh Start assigned each homeowner represented by Madden to

other outlying attorneys after the homeowners signed a new retainer agreement.

(Oct. 6, 2011, at 95-96; Oct. 11, 2011, at 13-14, 25; PX 287, at 10-23; PX 293, at 29;

PX 294, at 57-59; PX 296, at 39-40, 43)

If the lender granted a loan modification, Foster or Caldwell conveyed the

lender's terms to the outlying attorney, who often reviewed the plan with the

homeowner. If the homeowner accepted the plan, Fresh Start closed the file, and the attorney received an additional $100. Fresh Start diverted each unsatisfied homeowner's refund requests to a "review committee," comprising Caldwell and Dillon. Neither an outlying attorney nor a customer service representative nor the representative's supervisor could grant a refund request. Nonetheless, the "review committee" usually granted to an unsatisfied homeowner a refund suggested by an outlying attorney. (Tr. Oct. 5, 2011, at 157; Tr. Oct. 6, 2011, at 100, 139-40, 189-90, 224; Oct. 11, 2011, at 28; PX 108; PX 171; PX 287, at 6-8; PX 288, at 6; PX 292, at 34-35; PX 298, at 41-44; PX 288, at 23-24; PX 293, at 32-33; PX 299, at 12-13)

As McDaniel's testimony reveals, Fresh Start ultimately operated solely as a middle-man, intermediary, or "expediter" between the homeowner and the lender:

> THE COURT:    Let me ask you sort of a broad question so I understand what your position is. With respect to . . . the mortgage modification plan portion of your service . . . what service were you providing to the client in exchange for $2,000?
>
> . . .
>
> DEFENDANT MCDANIEL: Yes, sir. Basically, just to give you an example – and I spoke to these clients and I know we had clients telling our [customer service representatives], where they had attempted on numerous occasions to try to work out something with their lender. Being that they were working, they couldn't remain on hold for 20, 30, 45 minutes at a time sending over documents, having them lost, resending them, having them lost. And the service we were providing was to not only have the ability to do that for them, but to also make sure that we had all of the correct documentation. We were not in contact with the collections area, we were in contact with the area that would make the determination on the modification.
>
> . . .

THE COURT:     You knew who to call?

DEFENDANT MCDANIEL:     Yes, sir, we did.

THE COURT:     And you knew what information they wanted?

DEFENDANT MCDANIEL:     Yes, sir, and, unfortunately, the clients did not.

THE COURT:     And you had an organizational mechanism available for that information?

DEFENDANT MCDANIEL:     Very much so, sir.

(Oct. 6, 2011, at 28-30)

## IV. CONSUMER TESTIMONY

Four consumers testified for the FTC. First, Dwana Crossty, a homeowner from Cincinnati, Ohio, initially telephoned Fresh Start on June 2, 2009, after receiving a postcard with Attorney David Benson's signature. During the initial call, Crossty spoke with Anthony Rucker, a salesperson, and "Anna," a "paralegal," one of whom informed Crossty that she qualified (or "was approved") for the "Fresh Start Program" and, consequently, should stop paying the mortgage. After the initial call, Crossty believed that her mortgage payment would be reduced $200 to $300 per month. Crossty's handwritten notes from June 2, 2009, appear on her postcard (PX 308) and corroborate (1) the belief of a $200 to $300 reduction, (2) the employees Anthony Rucker and Anna, (3) the details of the payment plan, and (4) the advice not to pay the lender during the workout. Additionally, Crossty wrote on the

postcard "Law Firm" and "should work out Thank you Jesus." (PX 308; Tr. Oct. 3, 2011, at 73-119)

After enrolling in the "program" and establishing a payment plan, Fresh Start referred Crossty to Jeremiah Johnston, another "paralegal," that is, her assigned customer service representative. Crossty regularly spoke with Johnston from June through September but lost contact in October. After the TRO, outlying attorney Benson's outlying paralegal (as opposed to a Fresh Start "paralegal") called Crossty and suggested that Crossty begin faxing to Benson's office documents previously submitted to Fresh Start. In June, 2010, Crossty asked Benson for a refund. Benson responded that the FTC froze the money and that his representation would continue "*pro bono*." Crossty received neither a loan modification nor a refund, and the lender foreclosed on the home. (Tr. Oct. 3, 2011, at 73-119)

Second, homeowner Traci Sekora initially telephoned Fresh Start, after receiving "a couple days after" February 19, 2009, a postcard with Attorney Bruce Meltzer's signature. On the back, the postcard identified a return recipient, "Hope4Homeowners," and included a paragraph on the front beginning "Hope4Homeowners is a new Government Bailout Program designed for homeowners just like you who have fallen behind on their mortgage." (PX 284) Because of the words "Hope4Homeowners is a new government bailout program," Sekora believed "there was a connection between the people who sent the postcard and the bailout program." (Tr. Oct. 3, 2011, at 125) After enrolling in the "program,"

Sekora received by fax the "Application for Legal Services." No Fresh Start representative advised Sekora to stop paying her lender.  (Tr. Oct. 3, 2011, at 119-54)

Third, homeowner Linda Starcher received in September, 2009, a postcard with Attorney Pauline Aydin's signature. Hoping to extinguish a four-month arrearage, Starcher enrolled in the "program" and paid $2,000 in installments. Upon direction from the "New Horizon Law Center,"[8] Starcher stopped paying the mortgage after enrolling in the "program." In November, 2009, Starcher was served with foreclosure papers. Appearing at the foreclosure mediation on behalf of Starcher, Aydin helped stop the foreclosure. However, due to compounded arrearage, Starcher's payment increased $100 per month. (Oct. 3, 2011, at 154-86)

Fourth, homeowner Dianne Schuster received in April, 2009, a postcard displaying Attorney David Benson's signature. Schuster testified she concluded that the words "federal program," which appeared on the postcard, "meant it was a federal program, that the government was involved."(Tr. Oct. 4, 2011, at 24) Before contacting Fresh Start, Schuster confirmed with friends in Cleveland that Benson was an attorney.  After speaking at least three times with Anthony Rucker, a "legal assistant," Schuster enrolled in the program and expected "a possibility" of reducing the first mortgage and extinguishing the second mortgage. (Tr. Oct. 4, 2011, at 26) Schuster testifies that Rucker explained the means:

---

[8] Owned and operated by Bishop and McDaniel, "New Horizon Law Center" was the company "poaching" employees from Fresh Start.

Q.   Okay. And this notation on the front of PX310 [Schuster's notes from the conversation], the lower left-hand corner – can you read what that says?

A.   "Legal to legal."

Q.   And what does that mean to you?

A.   Anthony [Rucker] explained to me that a lot of the mortgage companies won't talk to me because I am not in any kind of a legal position to speak to them, so what this program is going to do is their legal department is going to speak to the legal department of my mortgage company and that's how it was going to be taken care of.

(Tr. Oct. 4, 2011, at 26) Fresh Start advised Schuster to stop paying the first mortgage for three months because "they wouldn't even start the process until actually the second or third month." (Tr. Oct. 4, 2011, at 34) Schuster stopped paying the first mortgage. Notes from Schuster's initial conversation with Rucker confirm an understanding (1) that she qualified for both the New Start Program and a bankruptcy, (2) that the "program" could reduce her interest rate to 4.5%, and (3) that the "program" would help build her credit. Additionally, her notes include Attorney Benson's "paralegal's" telephone number, which is the telephone number to Fresh Start's customer service department in Clearwater, Florida. (Tr. Oct. 4, 2011, at 9-43; PX 310; PX 311)

Schuster testifies to "numerous" calls between Fresh Start and her. She testifies that Fresh Start repeatedly requested identical information because the lender

allegedly repeatedly lost the information.[9] Unable to contact Fresh Start after receiving a foreclosure notice in November, 2011, Schuster called her outlying attorney, Benson, whose outlying paralegal advised that Benson would continue "*pro bono*" representation. Eventually, Schuster received a loan modification through a legal-aid service. (Tr. Oct. 4, 2011, at 9-70)

## V.  THE SALES SCRIPT

Creating an important issue of fact, McDaniel denied at trial the use of each proffered sales script, the "BK Pilot" script (PX 231) and the RFA script (PX 322). Each script contains an identical sales pitch. McDaniel concedes that he authored each script but contends that the script remained unused until after his termination from Fresh Start on September 7, 2009:

> Q.  Could you tell the Court about that BK script, please?
>
> A.  Well, my understanding is, is that there was a script that was created by me that never was implemented. I didn't have access to that script. The script that I saw was not that script, if that's what you are asking.
>
> Q.  Well, do you have any personal knowledge as to whether that BK script was ever utilized by the company in its communication with the clients and potential clients.
>
> A.  Not while I was there and I couldn't address it after that.
>
> . . .
>
> THE COURT:    What do you mean, if you created it and you didn't have access to it?

---

[9] Schuster's lender was Ocwen Financial Corporation. Outlying attorney Jim Kutkowski, who represented over a hundred homeowners after the TRO, testified that Ocwen "was by far the worst [lender] to deal with." (Tr. Oct. 11, 2011, at 19)

> DEFENDANT MCDANIEL:    Well, what I meant by that is it
> was created, never implemented, and then once I was
> terminated, I did not have access to it.
>
> . . .
>
> THE COURT:    But it was created by you?
>
> DEFENDANT MCDANIEL: Correct, but never implemented.

(Tr. Oct 5, 2011, at 229-30) On cross-examination, the FTC asked McDaniel about

the RFA script:

> Q.    Mr. McDaniel, I'm going to put on the Elmo the first page
> of what was marked RFA 34 [PX 322] in the request for
> admissions sent to you on October 10th or approximately
> October 2010. This is a document that you admitted was
> authentic and that was used as a script for the defendants.
> Do you see that?
>
> A.    Yes, sir.
>
> Q.    And that's the same language that appears in Plaintiff's
> Exhibit 231 [the "BK Pilot" script]; is that correct?
>
> A.    I just have one question. This is nothing that I authorized
> or was used while I was there.
>
> Q.    But you have admitted that this was used by the
> defendants; is that correct?
>
> A.    That – it was an assumption, then, because I have no
> knowledge of that.

(Tr. Oct. 6, 2011, at 12) Bishop defense witness Michael Diedrich, a twenty-year-old

Fresh Start employee responsible for monitoring for compliance Fresh Start's sales

calls from late August, 2009, (a week before McDaniel's termination) to mid-

November, 2009. Diedrich admitted to Fresh Start's use (both before McDaniel's

termination and after McDaniel's termination) of the "BK Pilot" script (PX 231):

- 34 -

Q.   I'd like for you to look at [the "BK Pilot" script], Mr. Diedrich, and tell me if you've seen it before.

A.   Yeah. This would've been the overview of I believe this was the one before Jon [Phillips] fixed it, though.

Q.   The one before Jon fixed it?

A.   Yeah. Well, before he rewrote it. I know after a little while of him being there, he rewrote the pilot.

Q.   How did he rewrite it? Did he can you tell me the things that changed?

A.   Really, just the way that some of it was worded, kind of the order these questions were brought about. I mean, essentially, they're the same thing.

Q.   And how long after he got there did he do this reworking?

A.   Maybe a couple weeks.

(PX 291, at 14-15) During questioning from the defense at trial, Diedrich changed his testimony:

Q.   All right. During that deposition, do you have a recollection of being shown a manual, a job procedure manual?

A.   Yes.

. . .

Q.   Please examine that, sir.

A.   Yeah, it was the one I was shown.

. . .

Q.   Please examine the entire piece.

A.   It's the same format as the one we used, but this one actually has promises and guarantees in it. It's not something we would have allowed.

Q.   When you were presented with that document at your deposition, did you take the same time to examine it as you have in the courtroom today?

A.   No.

Q.   What did you do?

A.   I glanced at it and said that it was the paper, you know, we were using.

Q.   And you now believe –

A.   It was very similar.

Q.   I'm sorry, I –

A.   They looked the same. They have the same –

Q.   And do you now believe your testimony at the deposition was incorrect?

A.   Yes.

. . .

Q.   During your position monitoring phone calls, did you ever hear anyone using that script from the manual?

A.   No.

(Oct. 5, 2011, at 108-09) On cross-examination the FTC read Diedrich the sales pitch from the Jablonski transcript, which is identical to the RFA script, to the "BK Pilot" script, and to the Kraus transcript. Diedrich testified that each of the following statements was an unacceptable guarantee and that he would have reported the use of either statement to his supervisors:

• "The best part about the New Start Workout Program is that you will have a mortgage payment with a fixed interest rate that fits within your current budget." (Tr. Oct. 5, 2011, at 120; PX 5, at 20; PX 6, at 28)

- "What this means is that we will not – we'll negotiate with your lender to get your mortgage brought back to current, but it will be done in a way that, you know, it will actually fit into your current income and budget." (Tr. Oct. 5, 2011, at 121; PX 5, at 19; PX 6, at 27)

Diedrich testifies that he never heard either guarantee while monitoring calls. However, the Jablonski transcript and the Kraus transcript confirm that Fresh Start used the script consistently in late September and early October, a period in which Diedrich monitored calls throughout the day.

Asserting that Fresh Start never used the above sales pitch (authored by McDaniel) during McDaniel's tenure, Bishop and McDaniel offer only the self-serving testimony of McDaniel and the testimony of Diedrich, which suggests, at best, confusion, incompetence, or misunderstanding. Bishop and McDaniel claim that McDaniel authored the script before September 7th while anticipating the passage of the House of Representative's "cram-down" bill. Bishop and McDaniel insist that the script remained locked-away in parts unspecified or unknown until the post-September 7th discovery by an unspecified or unknown person, who decided to use the script as Fresh Start's operative sales pitch. Supported tenuously by self-serving, inconsistent, and implausible trial testimony, Bishop and McDaniel fail to persuade.

Supporting the conclusion that Fresh Start used the sales pitch during McDaniel's tenure, the record reveals (1) Diedrich's admitting in his deposition that

the BK Pilot script was used before Phillips "fixed it,"[10] (2) McDaniel's producing the RFA script in response to the request for admission,[11] (3) McDaniel's authoring of the BK Pilot script, (4) Fresh Start's using the script in late September, only three weeks after McDaniel's termination, and (5) the homeowners Crossty, Sekora, and Schuster testifying consistently.

Notably, the use or non-use of the script before McDaniel's termination was easily provable by both the FTC and the defense. The FTC was likely surprised at trial by both McDaniel's repudiation of the request for admission and Diedrich's rejection of the deposition testimony. However, aware that two important witnesses would change testimony, Bishop and McDaniel had available an array of alternatives to establish the non-use of the sales pitch during McDaniel's tenure. Bishop and McDaniel could have produced the script allegedly used by Fresh Start before McDaniel's termination. Bishop and McDaniel could have asked Phillips, the new manager of the sales department, whether the script changed in mid-September. Bishop and McDaniel could have asked a dozen Fresh Start salespeople whether the script changed in mid-September. Bishop and McDaniel could have asked Caldwell whether the script changed in mid-September. Bishop and McDaniel chose silence.

---

[10] Rule 801(d)(1)(A), Federal Rules of Evidence, excludes from the definition of hearsay a prior inconsistent statement given under oath by a witness. Thus, even if not stipulated into evidence, the deposition statement is admissible.

[11] Rule 801(d)(2), Federal Rules of Evidence, excludes from the definition of hearsay a statement by a party offered against the party. Thus, even if not stipulated into evidence, the RFA script (PX 322) is admissible.

McDaniel's and Diedrich's earlier and more spontaneous statements, the consumers' testimony, reasonable and direct inference from facts that establish the governing circumstances, and common sense compel a finding that Fresh Start used the sales pitch before McDaniel's termination.

## VI.  FRESH START'S "SUCCESS RATE"

The parties zealously dispute the "success rate" of Fresh Start's loan modification "program." The FTC defines "success rate" simply, as the percentage of homeowners who ultimately received a "beneficial" loan modification after paying at least one dollar to Fresh Start. However, a more accurate definition for the present purpose is the percentage of homeowners who received the consideration promised after providing the consideration due, that is, the percentage of homeowners who ultimately accepted a loan modification after fully paying Fresh Start and fully providing Fresh Start with each required financial document.

Andrew Dale, an FTC data analyst, testified for the FTC. Using database field and filter identifiers from the declaration (PX 267) of John Johnson (the computer technician who programmed Fresh Start's database) and parameters defined by FTC attorneys, Dale calculated among other statistics (1) the number of homeowners who paid Fresh Start at least one dollar for the loan modification service, (2) the number of homeowners who received a loan modification, and (3) the aggregate amount paid to Fresh Start by the homeowners. (PX 314, at 1-10, 12). Dale both excluded each

homeowner who purchased the bankruptcy service and limited the time to

November 1, 2008, through November 31, 2009. Dale's data shows:

- 2,943 homeowners paid for the loan modification service
- 555 homeowners received loan modifications

Thus, the FTC proposes a 19% success rate. (Tr. Oct. 4, 2011, at 203, 227; PX 314, at

1-10, 12)

Through Dale's cross-examination and through the testimony of John

Johnson, the defendants clarify that Dale's 2,943 includes homeowners who never

returned the retainer agreement, homeowners who never supplied the required

financial documents to submit to the lender, and homeowners whose applications

remained pending on December 4, 2009, long after the TRO closed Fresh Start.

(Tr. Oct. 4, 2011, at 216-17, 221; Tr. Oct. 6, 2011, 47-51, 188-92; PX 110, at 1)

After the TRO and at the direction of FTC attorneys, a summary (PX 110; the

"Dillon Memo") of clients represented on December 4, 2009, was compiled by

Dillon, Lewis, and Johnson. The FTC supplied the prescription for the summary,

including the prescribed time of January 1, 2009, to December 4, 2009. The Dillon

Memo includes:

- 2336 homeowners who enrolled with Fresh Start in 2009 and "made some sort of payment" in 2009
- 961 modifications were still pending on December 4, 2009, (after the TRO) and assigned to outlying attorneys
- 465 homeowners either cancelled the service or lost the home to foreclosure
- 44 homeowners failed to return required documents

- 202 homeowners contracted but failed to pay
- 107 homeowners became unreachable

(Tr. Oct. 6, 2011, at 126-33; PX 110, at 1)[12]

Several problems inhibit an accurate determination of success. First, the two documents analyze activity between two stated times. The FTC limited Dale's declaration to November 1, 2008, through November 31, 2009, but limited the Dillon Memo to the year 2009. Second, the Dale Declaration analyzes only loan modification clients, but the Dillon Memo analyzes both loan modification and bankruptcy clients. Dale excludes 264 Fresh Start bankruptcy clients, but Dale's exclusion pertains to clients during inconsistent and overlapping times. Third, the FTC fails to adjust or account for the net effect on the success rate of either the 465 homeowners who either cancelled or lost the home to foreclosure or the 107 homeowners with whom Fresh Start lost contact. Is Fresh Start "at fault" for each

---

[12] The Dillon Memo (PX 110) reads in full:

1. How many clients we serviced in 2009: 2336
    See attached

2. How many clients requested and received refunds:
    See attached – Total refunds 2008/2009
    Breakdown available, if requested

3. How many clients failed on their end and clients we couldn't get plans for:
    See attached of the following closed account reports:
    No time to process – 465
    No documents – 44
    No money – 202
    Lost contact – 107

4. How many clients are still in the system and where do they stand: 961
    All are assigned to attorneys.
    See attached list.

foreclosure regardless of circumstance and independent of the homeowner's finances upon enrollment with Fresh Start? Is Fresh Start "at fault" for losing contact with homeowners or should the calculation exclude these homeowners? How should the cancellations affect the success rate? Fourth, the parties fail to accurately define the 202 homeowners' failure to pay. Did the 202 fail to initially pay (and remain absent from Dale's 2,943)? Or did the 202 homeowners initially pay but fail to pay an installment (and are included in Dale's 2,943)? The FTC concludes that the "success rate" is 19%; the defendants conclude that the "success rate" is around 79%.[13] Evidence supports neither conclusion.

Instead, the evidence preponderates to a narrower range. Dale's declaration establishes 2,943 loan modification clients who paid one dollar to Fresh Start.[14] The Dillon Memo establishes 961 files pending after the TRO and forty-four homeowners who failed to submit required documents. Construed most favorably to the FTC and assuming that Fresh Start bears the blame for each failed loan modification, Fresh Start was responsible for 1938 homeowners, 555 of whom obtained a loan modification. Thus, the minimum success rate approximates 29%.

---

[13] Without a document supporting the calculation, McDaniel testified that, if Fresh Start sent the file to a lender, 79% of the homeowners received a loan modification. Even if assumed true, the number fails to account for homeowner files never sent to a lender. (Tr. Oct. 5, 2011, at 231-32)

[14] The defendants' proposed calculation begins with 2,336, the Dillon Memo's number of clients who paid in 2009. However, as Dale's Exhibit A confirms, Fresh Start began receiving both homeowners and payments before 2009. Additionally, listing the days of "first contact" between Fresh Start and homeowners whose files remained open after the TRO, Dale's Exhibit D confirms the registration of homeowners before 2009. (PX 314)

The calculation most favorable to the defendants assumes that the 202 homeowners initially paid but failed to fully pay, faults each of the 107 homeowners for losing contact, and faults each of the 465 homeowners for cancellation and foreclosure. Construed most favorably for the defendants, Fresh Start remained responsible for 1164 homeowners, 555 of whom obtained a loan modification. Thus, the maximum success rate approximates 48%. In sum, the evidence permits the confident determination of only a rate of success ranging between 29% and 48%.

## VII.  COMMON ENTERPRISE

If the structure, organization, and pattern of a business venture reveal a "common enterprise" or a "maze" of integrated business entities, the FTC Act disregards corporateness. A "common enterprise" operates if, for example, businesses (1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing. *Delaware Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964) (citing *Art National Manufacturing Dist. Co. v. FTC*, 298 F.2d 476, 477 (2d Cir. 1962)); *FTC v. Neovi, Inc.*, 598 F. Supp. 2d 1104, 1116 (S.D. Cal. 2008) (citing *Sunshine Art Studios, Inc. v. FTC*, 481 F.2d 1171, 1175 (1st Cir. 1973); *Delaware Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964); *FTC v. J.K. Publs., Inc.*, 99 F. Supp. 2d 1176, 1201-02 (C.D. Cal. 2000); *FTC v. Wolf*, 1996 WL 812940, at *8, 1997-1 Trade Cas. ¶ 71, 713 (S.D. Fla. Jan. 31, 1996)).

Jackson Crowder, AFS, Washington Data, Nationwide Marketing, RABC, and TABC operated as a "common enterprise." Starting together with MAS, either Bishop or McDaniel or Caldwell controlled (either formally or informally) the operation of each entity. Through RABC and TABC, important employees, such as Dillon and Johnson, and officers, such as McDaniel and Caldwell, worked for both Jackson Crowder and Washington Data. Jackson Crowder, AFS, Washington Data, Nationwide Marketing, RABC, and TABC shared an office in Clearwater, Florida. Through AFS and under the direction of Bishop, funds were commingled among Jackson Crowder, Washington Data, Nationwide Marketing, and AFS. Through Nationwide Marketing, Jackson Crowder and Washington Data shared nearly identical direct-mail advertising. Finally, employees and managers failed to recognize their employer's name and owners, such as Meltzer and Crowder (both an attorney), failed to recognize a distinct corporate demarcation between each company. Accordingly, an act by one entity constitutes an act by each entity comprising the "common enterprise."

## VIII.   THE FTC ACT AND THE TELEMARKETING SALES RULE

Section 5 of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce" and requires the FTC to demonstrate a material representation likely to "mislead consumers acting reasonably under the circumstances." *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003) (citing *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7thCir. 1988)).

Advertising deception is evaluated from the perspective of the reasonable prospective purchaser, that is, a reasonable consumer in the audience targeted by the advertisement. *Kalwajtys v. FTC*, 237 F.2d 654, 656 (7th Cir. 1956); *Aronberg v. FTC*, 132 F.2d 165, 167 (7th Cir. 1942) ("Advertisements must be considered in their entirety, and as they would be read by those to whom they appeal.") (citing *Ford Motor Co. v. FTC*, 120 F.2d 175, 182 (7th Cir. 1941)); *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993, 1010 (N.D. Ind. 2000); Robert Pitovsky, *Beyond Nader: Consumer Protection and the Regulation of Advertising*, 90 HARV. L. REV. 661, 675 (1977) ("The standard for 'deception' has been the 'average' or 'ordinary' person in the audience addressed by the ad, taking into account that many who may be misled are unsophisticated and unwary."). In *In Re Cliffdale Associates, Inc.*, 103 F.T.C. 110, at *47 (1984), the Federal Trade Commission explains:

> To be considered reasonable, the interpretation or reaction does not have to be the only one. When a seller's representation conveys more than one meaning to reasonable consumers, one of which is false, the seller is liable for the misleading interpretation. An interpretation will be presumed reasonable if it is the one the respondent intended to convey.

Section 5 lacks an "extravagant claim" defense. *Tashman*, 318 F.3d at 1278-79. Thus, if the evidence reveals a misrepresentation upon which a reasonable consumer would rely, a defendant may not prevail by arguing that the consumer acted irrationally by relying on the misrepresentation. *Tashman*, 318 F.3d at 1278-79.

A representation is material if likely relied upon by a reasonable prospective purchaser. *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1266 (citing *FTC v.*

*Jordan Ashley, Inc.*, 1994-1 Trade Cas. (CCH) ¶ 70, 570 at 72,096, 1994 WL 200775 (S.D. Fla. 1994)); *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, *37 (1984) ("[A] material representation, omission, act or practice involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding a product."); *In re Southwest Sunsites, Inc.*, 105 F.T.C. 7, 149 (1985), *aff'd*, 785 F.2d 1431 (9th Cir. 1986); RESTATEMENT (THIRD) OF UNFAIR COMPETITION (1995) § 3, cmt. b ("The materiality of a representation, like its meaning, must be determined from the perspective of the audience to whom it is directed. . . . If a significant number of prospective purchasers are likely to attach importance to the representation in determining whether to engage in a proposed transaction, the representation is material."). An express claim used to induce the purchase of a service is presumed material. *Transnet*, 506 F. Supp. 2d at 1267 (citing *In re Thompson Medical Co.*, 104 F.T.C. 648, 816 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986)).

Rather than an isolated word, phrase, or sentence, the representation's "net impression" controls. *Tashman*, 318 F.3d at 1283 (Vinson, J., sitting by designation, dissenting) (citing *Removatron Int'l Corp v. FTC*, 884 F.2d 1489, 1496-97 (1st Cir. 1989)); *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir. 1976); *Nat'l Bakers Servs., Inc. v. FTC*, 329 F.2d 365, 367 (7th Cir. 1964) ("Deception may be by innuendo rather than outright false statements."). Only a tendency to deceive is required; actual consumer deception is unnecessary. *Tashman*, 318 F.3d at 1283 (Vinson, J., dissenting) (citing *Trans World Accounts, Inc. v. FTC*, 594 F.2d 212, 214 (9th Cir.

1979)). Nonetheless, consumer interpretation informs whether a communication was deceptive. *Tashman*, 318 F.3d at 1283 (Vinson, J., dissenting) (citing *FTC v. World Vacation Brokers, Inc.*, 861 F.2d 1020, 1030 (7th Cir. 1988)).

Responding to a directive from Congress to prescribe rules prohibiting "deceptive" telemarketing practices, the FTC promulgated the Telemarketing Sales Rule ("TSR"), which prohibits "sellers" both from misrepresenting a "material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer" and from misrepresenting an "affiliation with, or endorsement or sponsorship by, any person or government entity."[15] 15 U.S.C. § 6102(a)(1); 16 C.F.R. § 310.3(a)(2)(iii), (vii). Identical principles of deception from Section 5 of the FTC Act apply to the TSR, and a violation of the TSR amounts to both a deceptive act or practice and a violation of the FTC Act. 15 U.S.C. §§ 57a(d)(3) & 6102(c)(1); *FTC v. USA Financial, LLC*, 415 F. App'x 970, 974 (11th Cir. 2011); *FTC v. Stefanchik*, 559 F.3d 924, 929-30 (9th Cir. 2009); *FTC v. Munoz*, 17 F. App'x 624, 626-27 (9th Cir. 2001); *FTC v. Medical Billers Nework, Inc.*, 543 F. Supp. 2d 283, 313 n.32 (S.D.N.Y. 2008).

---

[15] Section 310.6(b)(6) exempts from the Telemarketing Sales Rule "[t]elephone calls initiated by a customer . . . in response to a direct[-]mail solicitation" if the solicitation contains disclosures enumerated in Section 310.3(a)(1). Because the postcards lack the disclosures, the exemption is inapplicable to this action.

### A. Counts One & Three: The Alleged Loan Modification Guarantee

In Counts One and Three, the FTC alleges that each defendant violated Section 5 of the FTC Act and violated the Telemarketing Sales Rule by misrepresenting that the Enterprise "directly or indirectly, expressly or by implication, . . . will obtain for consumers mortgage loan modifications, in all or virtually all instances, that will make their mortgage payments substantially more affordable." (Doc. 1, at ¶¶ 29-30, 41) As explained above, the "success rate" ranged from 29% to 48% and approached nowhere near 100%. Because Fresh Start's "net representation," including the postcard and the sales pitch, could lead a reasonable homeowner in the target audience to believe that a $2,000 payment to Fresh Start secured a loan modification, Fresh Start violated the FTC Act and the Telemarketing Sales Rule.

A number of facts from the sale and marketing of Fresh Start services combine to create a deceptive "net impression" of a guarantee. Appearing in red font and capital letters the statement "pre-qualified" on the front right corner of each postcard leads the homeowner to believe that the homeowner has satisfied the conditions preceding qualification for some unspecified financial opportunity. Next, during the initial telephone call, Fresh Start's collection of financial data leads a homeowner to believe that Fresh Start is computing the likelihood of an affordable loan

modification for the homeowner.[16] Despite the result, the computation concludes

with the statement, "[b]ased on the information you have provided so far, it looks

like you will be able to qualify for the New Start Work Out program." Finally,

informing the homeowner that the "New Start Work Out Program" secures an

affordable loan modification, Fresh Start finalizes the deception with two explicit

guarantees:

- Based on that information you qualify for the New Start Work Out Program. What this means is that we will not only negotiate with your lender to get your mortgage brought back to current, but it will be scheduled in a way that you will actually be able to afford your mortgage payment.

- The best part about the New Start Work Out Program is that you will have a mortgage payment with a fixed interest rate that fits within your current budget.

(PX 5, at 19-20; PX 6, at 27-28; PX 231, at 3; PX 322, at 2)

The "net impression" portrays a product (or "program") materially different

from the mere services of an "expediter." After receipt of a postcard stating "pre-

qualified," after a detailed analysis of personal finances, after a verbal assurance of

qualification for the "New Start Work Out Program," and after a guarantee that the

"New Start Work Out Program" secures a "mortgage payment with a fixed interest

rate that fits within your current budget," a reasonable prospective purchaser could

reasonably believe that a $2,000 payment secures an affordable home loan. With this

---

[16] The sales script includes an introduction, which provides, "Now I am a Legal Assistant but not an Attorney, so I need to ask you a few questions to find out which program will best assist you in your situation." *See, e.g.*, PX 231, at 2.

"net impression," Fresh Start within a year convinced thousands of cash-strapped homeowners facing imminent foreclosure to front $2,000 in cash to an opaquely defined "New Start Work Out Program," a mere "expediter" with no independent authority to modify a loan. *FTC v. Capital Choice Consumer Credit, Inc.*, No. 022-21050-CIV, 2004 WL 5149998, at *33 ("[A] Court may not ignore overwhelming evidence that reasonable consumers were likely to rely on, and in fact did rely on, Defendants' misrepresentations and impose on consumers a duty of 'walking around common sense.'" (quoting *Tashman*, 318 F.3d at 1278)).

The defendants argue that the retainer agreement contains a sufficient disclaimer to dispel a misrepresentation about a guarantee and a misrepresentation about Fresh Start's service. The disclaimer fails. First, the homeowner receives the retainer agreement far too late and only after receiving the postcard, hearing the guarantees in the initial sales call, and establishing a payment plan.[17] *Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975) ("The Federal Trade Act is violated if [the seller] induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract.") (citing *Exposition Press,*

---

[17] Undercover FTC Investigator Jablonsky attempted to obtain "some papers" before entering a payment plan with Fresh Start, whose salesperson, "Jenny," responded:

> Well, they won't send the documents out unless you've enrolled, even if we did like a post-date on a payment. Those are legal, sacred documents. They're not going to release it, you know, without you – without some type of commitment from you. . . . You know, because that's releasing our attorney's information, their contact information, your payments, what we can do for you and so forth.

(PX 6, at 31)

*Inc. v. FTC*, 295 F.2d 869, 873 (2d Cir. 1961)). Second, Fresh Start inconspicuously buried the "no guarantee" language at the end of paragraphs on the first page of the six-page "Application for Legal Services." Even assuming a timely disclaimer, the "no guarantee" language fails to sufficiently change the deceptive "net impression." *Removatron Int'l Corp.*, 884 F.2d at 1497 ("Disclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings.") (citing *Giant Food, Inc. v. FTC*, 322 F.2d 977, 986 (D.C. Cir. 1963)); *FTC v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999) (granting the FTC's motion for summary judgment and noting that a disclaimer excluded from the initial representation but found "on the contract that consumers eventually sign" insufficiently dispels initial deception); *FTC v. Minuteman Press*, 53 F. Supp. 2d 248, 262-63 (E.D.N.Y. 1998).

Fresh Start violated Section 5 of the FTC Act and violated the Telemarketing Sales Rule, 16 C.F.R. § 310.3(a)(2)(iii), by creating a deceptive "net impression" that a $2,000 payment secures an affordable home loan and, consequently, deceptively overstating the likelihood of the receipt of an affordable home loan.

### B. Counts Two & Four: The Alleged Misrepresentation
### of Affiliation with the United States Government

In Counts Two and Four, the FTC alleges that the defendants violated the FTC

Act and the Telemarketing Sales Rule, 16 C.F.R. § 310.3(a)(2)(vii), by

misrepresenting an affiliation with the United States government. With no evidence

that Fresh Start representatives stated or suggested during telephone calls with

homeowners that Fresh Start was affiliated with the United States government, the

FTC relies on the postcard (and selected homeowner interpretation of the postcard)

to prove the deception. The postcard alone, however, fails to mislead a prospective

purchaser acting reasonably under the circumstances into the belief that Fresh Start

had an "affiliation with, or endorsement or sponsorship by, any person or

government entity." Counts Two and Four fail.

### C. Count Three: The Alleged Misrepresentation
### of the Attorney's Involvement

Additionally, the FTC alleges that Fresh Start violated the Telemarketing Sales

Rule, 16 C.F.R. § 310.3(a)(2)(iii), by overstating the extent of attorney involvement

with the loan modification service. The "representation" of actual and extensive

attorney involvement in the "program" begins with receipt of the postcard with the

prominent display of an attorney's signature. The "representation" continues during

the initial telephone call, in which the salesperson is introduced as both a "paralegal"

and a "legal assistant" and the salesperson asks the homeowner, "As we both know

the bank has their collections [department] and attorneys representing them but who is representing you? That's where we come in." (PX 231, at 3) Finally, the retainer agreement provides an outlying attorney's name and the abbreviation of the contracting party as "Law Firm."

In combination, the communications could lead a prospective purchaser acting reasonably under the circumstances to believe that the homeowner is retaining a law firm with an attorney in the homeowner's state (not an administrative assistant in Florida) actively involved in loan modification negotiations. Extensive evidence from homeowners, customer service representatives, and even McDaniel and Caldwell demonstrates that administrative assistants (and not attorneys) negotiated with the lender. As evident by the outlying attorneys' meager $200 fee, absent a rare circumstance, the attorney represented the client in name only. The extent of the attorneys' participation in Fresh Start's loan modification service conflicts dramatically with the "representation" communicated by Fresh Start. Accordingly, Fresh Start violated the Telemarketing Sales Rule by misrepresenting a "material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer."

## IX. INDICVIDUAL LIABILITY

Seeking to impose against each individual defendant both a money judgment and an injunction, the FTC must prove that the individual defendant either participated directly or had authority to control the deceptive practice. *FTC v. Gem*

*Merchandising Corp.*, 87 F.3d 466, 470 (11th Cir. 1996) (citing *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989)). Also, the FTC must prove that the individual defendant knew or should have known of the alleged deceptive misrepresentation. *Amy Travel*, 875 F.2d at 574. The FTC decisively proved that each individual defendant either knew or should have known of each alleged misrepresentation. Accordingly, individual liability turns on whether each defendant either participated directly or had authority to control the deceptive practice.

### *A. Richard Bishop*

Ample evidence confirms that Bishop persuasively influenced and held authority to control each alleged deceptive practice through September 7, 2009, the day of McDaniel's termination. Through McDaniel, Bishop governed the sales and finances of the Enterprise. Through the computer database and the office furniture, Bishop controlled both the function and continued operation of the Enterprise. Through ownership and oversight of AFS, Bishop directed the flow of money within the Enterprise. Through the ownership of RABC, Bishop employed the men and women crucial to the success of the Enterprise.[18]

---

[18] On the first day of trial, October 3, 2011, Bishop offered a concession through counsel. (Tr. Oct. 3, 2011, at 8, 47-48) Terming the principle "common enterprise," Bishop's counsel offers a perplexing monologue that apparently concedes Bishop's individual liability:

> Your Honor, we'll stipulate right now that Bishop – and save a lot of time, I believe, in testimony and evidence. Mr. Bishop has abandoned the common enterprise. I think that he could have put it, but Mr. McDaniel and Ms. Caldwell don't have any money. Out of their homes in foreclosure, as is Bishop, Bishop had – his account has been frozen, so he's the target. He's not going to let his friends just defend themselves and act like (continued...)

However, the FTC identifies scant evidence that Bishop maintained the same level of control over Fresh Start on September 8, 2009, a day after Meltzer terminated McDaniel and entered the severance agreement. Supported by Meltzer's firing of McDaniel, Meltzer's termination of the severance, and Bishop's and McDaniel's failed clandestine attempt to "poach" employees from Fresh Start, Bishop was divested on September 7th of the power and authority once wielded over the Enterprise.

### B. Brent McDaniel

Similarly, ample evidence confirms (and McDaniel declines to contest) that McDaniel held enormous power to control each alleged deceptive practice through September 7th. The "ultimate authority" within the office, McDaniel admits managing Jackson Crowder and Washington Data, designing and distributing the postcards, and overseeing the sales and marketing division. However, upon the September 7th termination, McDaniel lost control over the Enterprise.

---

[18](...continued)
he's not – he's not their friend and wasn't involved. . . . But Mr. Bishop, in July, got out on the other side of the fence, and Mr. McDaniel was fired on September the 7th. Not exactly somebody who controlled the enterprise. And Mr. Bishop was very angry about it, but there was nothing he could do about it.

(Tr. Oct. 3, 2011, at 47-48) Whether conceding that Bishop stands liable for the actions of the Enterprise or whether conceding that the entities operated as a common enterprise, the outcome of the litigation remains the same.

### C. Tyna Caldwell

Like Bishop and McDaniel, Caldwell's authority and control over the Enterprise changed on September 7, 2009, when Meltzer fired McDaniel. Although Caldwell claims merely "super-secretary" authority throughout Fresh Start's existence, the evidence confirms that Caldwell held nearly plenary authority over the operation division's "day-to-day" affairs and the operation division's nearly thirty employees. Before McDaniel's termination, however, Caldwell maintained little to no authority over the sales division, the salespeople, and the deceptive sales script.

Once Meltzer terminated McDaniel, however, Caldwell ascended to fill the void as *de facto* leader of the newly named Meltzer Law Group, comprising both the operation division and the sales division. With Bishop and McDaniel no longer associated with the company and with Meltzer commuting to Florida and unfamiliar with the company's affairs, Caldwell remained the only person in Clearwater with enough experience to effectively and efficiently manage the company. Managing both Jon Phillips, the new sales manager, and Fresh Start's operation division, Caldwell as Meltzer's "right-hand" person had the authority to stop the deception.

Although the FTC has failed to prove that Caldwell through the sales script directly participated in guaranteeing loan modifications, after McDaniel's termination on September 7th, Caldwell could control the sales division, the sales pitch, and, consequently, the misrepresentation about the service.

# X. RELIEF

Under Sections 13(b) and 19(b) of the FTC Act, the FTC seeks to "disgorge" $3,941,588, the Enterprise's purported net revenue and the purported amount of consumer injury.[19] The FTC's request merges the FTC Act's governing remedial statutes and muddles disgorgement, measured by the defendants' unjust enrichment, with an award of damages, measured by the consumers' loss. An unraveling of the FTC's request requires an explanation of the FTC Act's governing remedial statutes.

Two sections of the FTC Act, Section 13(b), 15 U.S.C. § 53(b), and Section 19(b), 15 U.S.C. § 57b, govern the relief available to the FTC. Remedying "any provision of law enforced by the Federal Trade Commission," Section 13(b) permits final relief and temporary relief, the latter through a temporary restraining order and a preliminary injunction. On the other hand, Section 19(b) permits only final relief and only for a violation of a promulgated rule, such as the Telemarketing Sales Rule, and not for a violation of a statute, such as Section 5, unless the FTC first issues a final cease and desist order. 15 U.S.C. § 57b(a); *United States v. Building Inspector of America, Inc.*, 894 F. Supp. 507, 522 n.17 (D. Mass. 1995).

## A. Section 13(b)'s Limitation on Recovery: Unjust Gain

In *FTC v. Gem Merchandising Corp.*, 87 F.3d 466 (11th Cir. 1996), the district court under Section 13(b) ordered the defendant to reimburse consumers $487,500.

---

[19] Without citation to either pertinent fact or law, the FTC states that consumer injury greatly exceeds $3,941,588 because losses from foreclosures and higher mortgage payments, both purportedly resulting from Fresh Start's services, are excluded from the $3,941,588.

To the extent the distribution to the consumers was not feasible, the defendant was to deposit the remainder in the U.S. Treasury. The defendants argued that Section 13(b) limited the district court's authority to redressing the loss of a defrauded consumer and that the district court erred by disgorging a sum that exceeds consumer redress. *Gem Merchandising* relies on *Porter v. Warner Holding Co.*, 328 U.S. 395 (1946), which holds that, if a statute expressly grants the power to enjoin an illegal practice and "[u]nless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction." *Porter*, 328 U.S. at 398. Section 13(b) provides "an unqualified grant of statutory authority" to issue "the full range of equitable remedies," including disgorgement, which considers only the defendant's unjust gain and ignores consumer loss. *Gem Merchandising*, 87 F.3d at 468, 469; *FTC v. Bishop*, 425 F. App'x 796, 797-98 (11th Cir. 2011) (citing *Commodity Futures Trading Comm'n v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1345 (11th Cir. 2008)); *FTC v. United States Oil & Gas Corp.*, 748 F.2d 1431, 1433-34 (11th Cir. 1984). Thus, *Gem Merchandising* permits a district court under Section 13(b) to disgorge a defendant's unjust enrichment, even if the unjust enrichment exceeds the aggregate compensation to consumers.

However, if consumer injury exceeds the defendant's unjust enrichment, the "full range of equitable remedies" excludes a district court's awarding monetary relief measured by consumer injury. *Commodity Futures Trading Comm'n v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339 (11th Cir. 2008), considered 7 U.S.C. § 13a-1, a provision

of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1-26, that, like Section 13(b) of the FTC Act, carries "the full range of equitable remedies." *Wilshire*, 531 F.3d at 1344 (citing *Gem Merchandising* and equating the governing statutes). In *Wilshire*, the district court awarded to consumers "the amount of their losses stemming from the violations," a sum greater than the defendant's unjust enrichment. The defendants argued that an award established by consumer injury is a legal remedy and, therefore, outside the equitable power of the district court. *Wilshire* agrees and holds (1) that an award based on consumer injury and exceeding unjust enrichment is outside the "full range of equitable remedies" and (2) that the proper relief is the amount that the defendants "wrongfully gained by their misrepresentations." 531 F.3d at 1345; *see also FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 67 (2d Cir. 2006) ("The district court measured the appropriate amount of restitution as 'the full amount lost by consumers.' This was error."). Thus, Section 13(b) permits disgorgement measured by a defendant's unjust enrichment but prohibits a monetary award measured by the consumers' loss.

### B. Unjust Gain: Gross Receipts Less Revenue

Without citing evidence of the Enterprise's expenses, Bishop argues that profit (net revenue minus expenses), and not net revenue (gross receipts minus refunds), is the correct measure of the Enterprise's unjust, "ill-gotten," or "wrongful" gain. "Weighty authority supports the contrary view." *FTC v. Home Assure, LLC*, No. 8:09-cv-547-T-23TBM, 2009 WL 1043956, *3 (M.D. Fla. Apr. 16, 2009).

Bishop argues that a mandate issued in this action by the Eleventh Circuit specifically requires under Section 13(b) a measurement of profit as unjust gain. Bishop states that the passage was "explicit." The mandate's section entitled "Scope of Asset Freeze" reads in full:

> This court reviews an asset freeze for abuse of discretion. *Commodity Futures Trading Comm'n v. Levy*, 541 F.3d 1102, 1110 (11th Cir. 2008). Bishop claims the district court abused its discretion by granting a preliminary injunction that froze all of his assets, other than an allowance for personal expenses, inconsistent with principles of equity.

> The FTCA's grant of authority to issue an injunction carries the full range of equitable remedies, among which is the power to grant restitution. *Wilshire*, 531 F.3d at 1344 (quoting [*FTC*] *v. Gem* [*Merchandising*] *Corp.*, 87 F.3d 466, 468-69 (11th Cir. 1996)). Restitution is an equitable remedy designed to cure unjust enrichment of the defendant. *Id.* at 1345 (citation omitted). Specifically, restitution and disgorgement deprive the defendant of his ill-gotten gains; these equitable remedies do not take into consideration the plaintiff's losses. *Id.* (citation omitted). The "burden for showing the amount of assets subject to disgorgement (and, therefore available for freeze) is light: 'a reasonable approximation of a defendant's ill-gotten gains is required . . . Exactitude is not a requirement.'" *Sec. & Exch. Comm'n v. ETS Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir. 2005) (quoting *Sec. & Exch. Comm'n v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004)).

> The district court abused its discretion by imposing too broad of an asset freeze without making any reasonable approximation of Defendant-Appellant's ill-gotten gains. Therefore, we remand this case to the district court to determine whether the asset freeze corresponds with a reasonable approximation of Bishop's unjust enrichment, in accordance with equitable principles.

*FTC v. Bishop*, 425 F. App'x 796, 797-98 (11th Cir. 2011). Bishop fails to identify where the passage states that profit is the measure of unjust gain under Section 13(b). Rather than instructing how to compute unjust gain, the passage only confirms

*Wilshire* and states that a defendant's unjust gain is the measure of disgorgement under Section 13(b).

Although the question remains unanswered in the Eleventh Circuit,[20] three other circuits hold that the amount of revenue, rather than the amount of profit, is the measure of unjust gain under Section 13(b). *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 375 (2d Cir. 2011); *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 14-16 (1st Cir. 2010); *FTC v. Febre*, 128 F.3d 530, 536 (7th Cir. 1997).[21] Similarly, *FTC v. Leshin*, 618 F.3d 1221, 1237 (11th Cir. 2010), a contempt proceeding brought by the FTC, cites *McGregor v. Chierico*, 206 F.3d 1378, 1388 (11th Cir. 2000), and disgorges the defendant's revenue. *See also FTC v. Kuykendall*, 371 F.3d 745, 765-67 (10th Cir. 2004) (same). Most recently, the Second Circuit rejects profit as the measure of disgorgement because "defendants in a disgorgement action are 'not entitled to deduct costs associated with committing their illegal acts.'" *Bronson*, 654 F.3d at 375 (quoting *SEC v. Cavanagh*, No. 98-Civ.- 1818-DLC, 2004 WL 1594818, at \*30 (S.D.N.Y. July 16, 2004)).

---

[20] Some cases cite *Gem Merchandising* for authority that "the full amount lost by consumers is the appropriate award of damages." *E.g.*, *FTC v. Global Marketing Group, Inc.*, 594 F. Supp. 2d 1281, 1290 (M.D. Fla. 2008). That view conflicts with *Wilshire* and misreads *Gem Merchandising*, which holds only that under Section 13(b) the amount disgorged as unjust gain may exceed the compensation to consumers.

[21] District courts within the Eleventh Circuit have reached the same conclusion. *Home Assure*, 2009 WL 1043956, at \*3; *FTC v. RCA Credit Servs., LLC*, 727 F. Supp. 2d 1320, 1336 (M.D. Fla. 2010) (Whittemore, J.); *FTC v. Nat'l Urological Group*, 645 F. Supp. 2d 1167, 1211-13 (N.D. Ga. 2008) (Pannell, J.); *FTC v. Peoples Credit First, LLC*, No. 8:03-cv-2353, 2005 WL 3468588 (M.D. Fla. Dec. 18, 2005) (McCoun, M.J.).

Thus, the weight of authority compels the conclusion that the Enterprise's net revenue, that is, gross receipts less refunds, resulting from the deception measures disgorgement under Section 13(b).

### C. *Section 19(b)'s Limitation on Recovery*

For a violation of the Telemarketing Sales Rule, Section 19(b) permits:

> [S]uch relief as the court finds necessary to redress injury to consumers . . . resulting from the rule violation or the unfair or deceptive act or practice, as the case may be. Such relief may include, but shall not be limited to, rescission or reformation of contracts, the refund of money or return of property, the payment of damages, and public notification respecting the rule violation or the unfair or deceptive act or practice, as the case may be; except that nothing in this subsection is intended to authorize the imposition of any exemplary or punitive damages.

Contrary to Section 13(b), Section 19(b) limits equitable jurisdiction by explicitly prohibiting exemplary and punitive damages. *See Gem Merchandising*, 87 F.3d at 466 (citing *Porter*, distinguishing Sections 13(b) and 19(b), and stating that "[t]his legislative command expressly limits a court's equitable jurisdiction").

Concerned solely with the plaintiff's injury, Section 19(b) confers no authority to award monetary relief that exceeds redress to consumers. In *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 606-08 (9th Cir. 1993), the defendant was ordered to cease and desist from deceptive marketing practices. After the order became final, the FTC sought consumer redress under Section 19(b). Instead of finding a specific sum of consumer redress, the district court ordered the defendant to pay redress through the FTC to each consumer who could "make a valid claim." The district court

established a range – at minimum the defendant's profit, $7,590,000, and at maximum the consumers' spending, $49,950,000. If the deceived consumers failed to submit claims that reached the minimum amount, the defendant was ordered to pay the difference through the FTC to non-profit organizations. The defendants argued that the number of valid claims established the sum of consumer redress and that, if the sum of consumer redress remained below the minimum, a payment of the difference was a punitive remedy prohibited by Section 19(b). The FTC responded that "it should be allowed to keep the money because it is in the nature of disgorgement."

   After quoting Section 19(b), the Ninth Circuit found the difference punitive:

> [T]he statute authorizes only "redress . . . to consumers," and specifically prohibits the imposition of exemplary or punitive damages." 15 U.S.C. § 57b(b). If disgorgement of Figgie's receipts would exceed redress to consumers, then in the circumstances of this case requiring Figgie to pay the Commission the excess would be for purposes of punishing Figgie, not making redress to the consumers who bought heat detectors. . . . Because Congress provided for "redress," Figgie's receipts and profits provide neither the top nor the bottom limit of the remedy.

994 F.2d at 607. Thus, Section 19(b) prohibits disgorgement in excess of consumer redress. *FTC v. Capital Choice Consumer Credit, Inc.*, No. 02-21050 CIV, 2004 WL 5149998, *45 (S.D. Fla. Feb. 20, 2004) ("*Figgie* merely stands for the proposition that under Section 19(b), a court may not order disgorgement in excess of redress."); *see also Figgie*, 994 F.2d at 607 (finding that Congress's intent under Section 19(b) is "only to authorize redress to consumers and others for 'injury resulting' from the trade practice").

### D. *Computing the Enterprise's Net Revenue*

With each defendant liable for a violation of both Section 5 and the Telemarketing Sales Rule, the FTC is entitled to relief under both Section 13(b) and Section 19(b). The FTC claims that $3,941,588 is both the Enterprise's net revenue and the consumers' injury. However, the FTC concedes that the record lacks evidence to accurately determine consumer loss, chooses not to establish consumer loss, and instead states "consumer losses far exceed Defendants' net revenue. The FTC seeks only to disgorge that net revenue." (Doc. 450, at 135) By seeking disgorgement, the FTC chooses to proceed under Section 13(b).

The FTC bears the burden to show the "reasonably approximate" amount of the defendant's unjust gain. Next, the burden shifts to the defendants to show the inaccuracy of the FTC's figure. *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 67 (2d Cir. 2006); *FTC v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997) (citing *SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996)). Although the FTC need not prove that each dollar of unjust gain accrued directly from the deception, the FTC must prove when the deception began. Entitled only to "unjust" gain, the FTC cannot disgorge net revenue received before the deception began. Similarly, the FTC cannot disgorge from an individual defendant net revenue received by the Enterprise before or after the defendant directly participated in, or had authority to control, the deception. Accordingly, no defendant is liable for the entirety of the Enterprise's net revenue.

As concluded above, the postcard alone is not a violation of either Section 5 or the Telemarketing Sales Rule. Thus, the Enterprise received no unjust gain until the occurrence of the verbal misrepresentation. Although the FTC failed to identify the first day of the verbal misrepresentation contained in the sales script, homeowner Traci Sekora's testimony confirms the misrepresentation at least as early as a "couple days" after February 19, 2012. Thus, the Enterprise's unjust gain began on February 21, 2009.

Bishop and McDaniel are liable for net revenue received by Fresh Start between February 21, 2009, and September 7, 2009, which is 199 days. Caldwell is liable for net revenue received by Fresh Start between September 8, 2009, and November 13, 2009, which is sixty-seven days.

Dale's declaration (PX 314) establishes a "reasonable approximation" of net revenue, which the defendants fail to refute with evidence. Because the defendants fail to submit the financial books of the Enterprise, the time of each payment escapes determination. Accordingly, the Enterprise's average daily net revenue multiplied by each defendant's days responsible provides the most available and accurate means of calculating each defendant's unjust enrichment.

Fresh Start received a payment from 2,963 homeowners for a gross revenue of $4,292,379. The exhibit establishes that Fresh Start "charged-back" $70,413 and refunded $303,188. Subtracting the "charge-backs" and the refunds from the gross

revenue, Fresh Start's net revenue from November 1, 2008, to November 30, 2009, equals $3,918,778.

November 1, 2008, to November 30, 2009, equals 395 days. The net revenue ($3,918,778) divided by 395 days equals a net revenue of $9,920.96 per day. Responsible for 199 days, McDaniel's and Bishop's joint and several liability is $1,974,270. Responsible for sixty-seven days, Caldwell's liability is $664,704.[22]

## E. Final Injunction

Because each defendant for years has engaged in the loss mitigation business, because each defendant has easily transferred from one loss mitigation company to the next, because defendants Bishop and McDaniel have founded at least four loss mitigation companies between 2004 and 2009, because Caldwell was employed by at least three loss mitigation companies during the last ten years, because each defendant has the technical knowledge to operate a loss mitigation company, because Bishop and McDaniel began Legal Admin Services only a few months before the entry of the TRO, and because the economic barriers to enter the loss mitigation industry are minimal, the FTC has proven a "cognizable danger" of a recurrent violation. *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953). A permanent injunction is warranted.

---

[22] Dale's declaration reveals twenty paying homeowners from Fresh Start's "legal database," which Fresh Start used only "through 2008." (PX 314, ¶ 13 & exh. B) Because neither the FTC nor the defendants prove when the twenty homeowners first contacted Fresh Start, the twenty homeowners from the "legal database" are excluded from this calculation.

# XI. CONCLUSION

The defendants Richard Bishop, John Brent McDaniel, and Tyna Caldwell each violated Section 5 of the FTC Act, 15 U.S.C. § 45(a), and the Telemarketing Sales Rule, 16 C.F.R. § 310.3(a)(2)(iii), by deceptively overstating the likelihood of obtaining a loan modification. Additionally, Bishop, McDaniel, and Caldwell each violated the Telemarketing Sales Rule, 16 C.F.R. § 310.3(a)(2)(iii), by deceptively overstating the function of the attorney in Fresh Start's service.

On or before **MAY 7, 2012**, the FTC shall propose a final injunction that complies with Rule 65(d), Federal Rules of Civil Procedure, by describing "in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." *See SEC v. Sky Way Global, LLC*, 710 F. Supp. 2d 1274, 1287-88 (M.D. Fla. 2010) (prohibiting an obey-the-law injunction and requiring a "properly refined, reasonably focused, final injunction . . . that prohibits the same category of act or acts as those warranting an injunction in the first instance."). On or before **MAY 21, 2012**, each defendant may respond to the proposed terms of the final injunction. Shortly after May 21, 2012, an injunction will issue, and the clerk will be directed to enter a judgment, including a money judgment, consistent with this order.

ORDERED in Tampa, Florida, on April 23, 2012.

_Steven D. Merryday_
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

# APPENDIX

**Attention Homeowner:**
The NEW START PROGRAM is a federal program designed for homeowners just like you who may have fallen behind on their mortgage. You have been selected to receive this offer to help relieve you from the burden of overdue mortgage payments, past medical and credit card debt.

**To take advantage of this offer you should call immediately 1-866-623-5315.**

Call now to learn how we can help you discharge your debt and relieve you of annoying phone calls and sleepless nights.

**THIS OFFER WILL NOT BE REPEATED. CALL NOW!**

Sincerely,

Pauline R. Aydin
Attorney at Law

**CALL NOW 1-866-623-5315**
Se Habla Español

PRE-QUALIFIED

**CALL IMMEDIATELY**
**1-866-623-5315**
*Daily 9AM to 10PM EST*
*Saturday 12PM to 5PM EST*
*Se Habla Español*

Copyright © 2008 All Rights Reserved. Printed in USA.

Please disregard if you have received this notice in error, public records are sometimes inaccurate.

Some of our clients are assisted persons under the Federal Bankruptcy Code. An "assisted person" means any person whose debts consist primarily of consumer debts and the value whose non-exempt property is less than $164,250. If you are an assisted person, we are a debt relief agency and we may help assisted persons file for bankruptcy relief under the Federal Bankruptcy Code. This is a solicitation for legal services.

**NEW START PROGRAM**

11470 Euclid Avenue # 401
Cleveland, OH 44106-3926

Kayla to-jee-ta
Steve Benton

FIRST-CLASS
PRESORT
U.S.
POSTAGE
PAID
RDI

THIS MAY BE YOUR

## FINAL NOTICE

You may qualify for assistance
that will enable you to pay
the total amount due
to your mortgage company.

## Call Immediately
## 1-866-623-5315

| Date of Record: | September 3, 2009 |
|---|---|
| Document #: | 1234-2784566-01 |
| County: | Portage |

Case # 5001-42-7729M
LINDA STARCHER
2709 CLERMONT ST
STREETSBORO, OH 44241-5106