UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FEDERAL TRADE COMMISSION,

    Plaintiff,

v.                                                CASE NO.: 8:09-cv-2309-T-23TBM

WASHINGTON DATA
RESOURCES, et al.,

    Defendants.
_____/

**ORDER**

An April 23, 2012, order (Doc. 454) finds that the defendants Richard Bishop, John Brent McDaniel, and Tyna Caldwell each violated Section 5 of the FTC Act, 15 U.S.C. § 45(a), and the Telemarketing Sales Rule, 16 C.F.R. § 310.3(a)(2)(iii), by deceptively marketing and selling mortgage modification services. Finding that each defendant presents a "cognizable danger" of a recurrent violation, an April 23, 2012, order (Doc. 454) directs the FTC to propose a final injunction that complies with Rule 65(d), Federal Rules of Civil Procedure, and describes "in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." *FTC v. Washington Data Resources, Inc.*, --- F. Supp. 2d ---, 2012 WL 1415323, *30 (M.D. Fla. Apr. 23, 2012); *see also SEC v. Sky Way Global, LLC*, 710 F. Supp. 2d 1274, 1287-88 (M.D. Fla. 2010).

The FTC proposes (Docs. 455, 455-1, 456) a final injunction that (1) permanently prohibits the marketing and selling of a mortgage-assistance service; (2) permanently prohibits telemarketing; (3) permanently prohibits misrepresenting a material fact about the performance, efficacy, nature, or characteristic of a product, service, plan, or program; (4) permanently prohibits collecting payment for a mortgage-assistance service; (5) requires destruction of consumer information; (6) requires delivery of certain assets to the FTC; (8) requires informing business partners about the injunction; (9) requires reporting for twenty years to the FTC selected changes to personal and business information; (10) requires maintenance for twenty years of accounting, personnel, and business records; and (11) permits the FTC to conduct comprehensive discovery without leave of court. The defendants respond (Doc. 458) with objections—some meritless, some colorable, and a few valid.

### I. The Proposed Ban on Telemarketing

First, the defendants argue that the breadth of the proposed ban on telemarketing requires rejection. Section III of the proposed injunction (Doc. 455-1) states "that Defendants, whether acting directly or through any person, are permanently restrained and enjoined from telemarketing or assisting others in telemarketing." Section I defines "telemarketing" as "a plan, program, or campaign (whether or not covered by the Telemarketing Sales Rule, 16 C.F.R. Part 310) which

is conducted to induce the purchase of goods or services or a charitable contribution, by the use of one or more telephones and which involves more than one interstate telephone call." In other words, the FTC proposes to remedy Tyna Caldwell's misrepresentation about a mortgage-assistance service by preventing, for example, her using a cellular phone to fund-raise for a grandchild's "little league" baseball team.

"A necessary and appropriate injunction against otherwise lawful conduct must be carefully limited in time and scope to avoid an unreasonably punitive or non[-]remedial effect." *United States v. Holtzman*, 762 F.2d 720, 726 (9th Cir. 1985) (citing *Sandura Co. v. FTC*, 339 F.2d 847, 861 (6th Cir. 1964)). An injunction "should be tailored to restrain no more than [] reasonably required to accomplish its ends," both to protect the interest of the parties and to accomplish the purpose of the applicable legislation. *Consolidation Coal Co. v. Disabled Miners of Southern W. Va.*, 442 F.2d 1261, 1267 (4th Cir. 1971); *Keener v. Convergys Corp.*, 342 F.3d 1264, 1269 (11th Cir. 2003) ("Injunctive relief should be limited in scope to the extent necessary to protect the interests of the parties."); *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1531 (11th Cir. 1996) ("An injunction 'must be tailored to remedy the specific harms shown.'" (quoting *Epstein Family Partnership v. Kmart Corp.*, 13 F.3d 762, 771 (3d Cir. 1994)).

The FTC's proposed telemarketing ban, unqualified in either time or scope, infringes unnecessarily the defendants' lawful commercial speech, a right protected by the First Amendment. *See Friedman v. Rogers*, 440 U.S. 1 (1979); *FTC v. Brown &*

*Williamson Tobacco Corp.*, 778 F.2d 35, 43 (D.C. Cir. 1985). The FTC's proposed telemarketing ban broadly prohibits the defendants' employing an entire medium of lawful advertisement and lawful commercial speech, that is, "speech which does 'no more than propose a commercial transaction.'" *Bolger v. Young's Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (quoting *Virginia State Bd. of Pharm. v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)). Although false, deceptive, or misleading commercial speech "'remains subject to restraint,'" a restriction on deceptive commercial speech "can be no 'broader than reasonably necessary to prevent the deception.'" *Brown & Williamson*, 778 F.2d at 43 (quoting *In re R.M.J.*, 455 U.S. 191, 200 (1982)); *accord Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980).

In support of the telemarketing ban, the FTC says that "[n]umerous courts have banned defendants from particular lines of businesses." *See FTC v. Gill*, 265 F.3d 944, 957 (9th Cir. 2001) (enjoining the defendant from engaging in the credit repair industry); *FTC v. Neiswonger*, 494 F. Supp. 2d 1067, 1083-84 (E.D. Mo. 2007) (banning the defendant "from marketing and selling business opportunity programs . . . [and] . . . telemarketing *of such programs*" (emphasis added)); *FTC v. Check Investors, Inc.*, 2005 U.S. Dist. LEXIS 37199, *8 (D.N.J. July 18, 2005) (banning the defendants from debt collection); *FTC v. Five Star Auto Club*, 97 F. Supp. 2d 502, 536 (S.D.N.Y. 2000) (banning the defendant from "multi-level marketing"). Additionally, the FTC cites *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965), and *FTC v. Nat'l*

*Lead Co.*, 352 U.S. 419, 431 (1957), for the often repeated pronouncement: "Having been caught violating the Act, respondents must expect some fencing in." But, an understanding of the Supreme Court's use of this catchy phrase benefits from consideration of the phrase's original context:

> [W]e find no defect in the provision of the order which prohibits respondents from engaging in similar practices with respect to "any product" they advertise. The propriety of a broad order depends upon the specific circumstances of the case . . . . [T]he respondents produced three different commercials which employed the same deceptive practice. This we believe gave the Commission a sufficient basis for believing that the respondents would be inclined to use similar commercials with respect to the other products they advertise. We think it reasonable . . . to frame [the] order broadly enough to prevent respondents from engaging in similarly illegal practices in future advertisements. The Commission is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past. Having been caught violating the Act, respondents must expect some fencing in.

*Colgate-Palmolive*, 380 U.S. at 395 (citations and quotations omitted). Complying with *Colgate-Palmolive*, the final injunction will ban the defendants from the "debt-relief" industry (but not entirely from commerce); will prohibit the defendants from telemarketing a "financial product or service" (but not every product or service); and will prove the FTC a monitoring mechanism for ten years (but not in perpetuity). The defendants are emphatically but reasonably "fenced," exactly as prescribed by *Colgate-Palmolive* (that is, subject to "some fencing in" but not silenced entirely and forever).

## II.  The Proposed "Obey-the-Law" Injunction

Under the heading "Prohibited Misrepresentations Relating to any Product or Service," the FTC seeks to enjoin the defendants from "misrepresenting or assisting others in misrepresenting, expressly or by implication, any material fact, including but no limited to . . . [a]ny material aspect of the performance, efficacy, nature, or characteristics of the product, service, plan, or program." In *SEC v. Sky Way Global, LLC*, 710 F. Supp. 2d 1274 (M.D. Fla. 2010), the SEC proposed an "obey-the-law" injunction that enjoined the defendant from violating Sections 5 and 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e & 77q(a); Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b); and Rule 10b–5, 17 C.F.R. § 240.10b–5. Citing a footnote from *SEC v. Smyth*, 420 F.3d 1225, 1233 n. 14 (11th Cir. 2005) (Tjoflat, J.), *Sky Way Global* rejects the proposed injunction. The SEC moved for reconsideration and argued that the broad injunction was permitted by *McComb v. Jacksonville Paper Co.*, 336 U.S. 187 (1949), which approved a "decree of . . . generality" that ordered the defendants to obey the wage, overtime, and record-keeping provisions of the Fair Labor Standards Act ("FLSA"). *Sky Way Global* summarizes *Jacksonville Paper*'s injunction:

> [*Jacksonville Paper*] approves an injunction that "[b]y its terms . . . enjoin[s] any practices which [a]re violations of th[e] . . . [minimum wage, overtime, and record-keeping] provisions." In approving the injunction, [*Jacksonville Paper*] states that a "decree of that generality"— that is, an injunction that goes beyond prohibiting the specific scheme or schemes that the defendant perpetrated or may perpetrate—is "often necessary to prevent further violations where a proclivity for unlawful conduct has been shown." For example, rather than requiring that an

> injunction identify each possible method by which an employer may circumvent the minimum wage requirement, an injunction may simply order an employer to pay a minimum wage. That way, the injunction is both precise enough to give an employer fair warning of the prohibited conduct and general enough to prevent the employer's evading the injunction by simply inventing a new method of circumventing the minimum wage requirement, which method the highly specific injunction failed to identify.

*Sky Way Global*, 710 F. Supp. 2d at 1296. As a consequence of "the highly precise dictates of the FLSA," the injunction in *Jacksonville Paper* "precisely delineated the prohibited conduct and provided unambiguous notice of the exact wage, hour, and record keeping requirements of the injunction." *Sky Way Global*, 710 F. Supp. 2d at 1296. Although characterized as a "decree of . . . generality," the *Jacksonville Paper* injunction is "reasonably detailed and appropriately refined." *Sky Way Global*, 710 F. Supp. 2d at 1296.

Highlighting Section 10(b) of the Securities Exchange Act, *Sky Way Global* contrasts the SEC's proposed injunction:

> The Exchange Act, for example, prohibits an expansive, indefinite category of acts and omissions, generally encompassing any imaginable fraudulent or deceptive scheme in connection with the purchase or sale of any kind of security. In contrast, the FLSA narrowly proscribes the failure to pay a defined minimum wage and rate of overtime compensation. The detail inherent in the FLSA permits an injunction that simply commands the defendant to comply with an FLSA provision or provisions (as would the command of statute mandating the purchase of car insurance before driving, or compliance with the applicable speed limit). Accordingly, an injunction ordering compliance with the FLSA's minimum wage requirement easily satisfies Rule 65(d). On the other hand, the Exchange Act permits no such injunction, because the Exchange Act utterly lacks a comparable level of detail. An employer enjoined from violating the minimum wage requirement knows that failure to pay the minimum wage will result in contempt, but a company enjoined from violating (generally and in any way) the

- 7 -

Exchange Act faces a limitless array of scenarios sufficient to warrant a sanction for contempt. Thus, [*Jacksonville Paper*] aptly demonstrates that the problem with an injunction's commanding compliance with the securities laws is not the mere fact that the injunction tracks the statutory language—the problem with ordering a defendant to obey the securities laws (and commanding no more than compliance with the broad dictates of the Securities Act, the Exchange Act, and Rule 10b-5) is the daunting breadth and complexity of the statutory (and accompanying regulatory) language. If the Exchange Act were as precise in each requirement as the FLSA (or, for that matter, as the car insurance statute) an injunction commanding compliance with a requirement of the Exchange Act would easily satisfy Rule 65(d). However, the Exchange Act is anything but precise (and perhaps necessarily so). The Exchange Act consists of a set of expansive, all-encompassing prohibitions and, thus, in order to comport with Rule 65(d), [Federal Rules of Civil Procedure,] an injunction commanding compliance with the Exchange Act must contain a more refined operative command capable of ascertainment and enforcement.[1]

---

[1] *SEC v. Goble*, --- F.3d ---, 2012 WL 1918819, *13 (11th Cir. May 29, 2012), considers an injunction enjoining a violation of Sections 15(c)(3) and 17(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78*o*(c)(3) & 78q(a) (notably, not Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a)). *Goble* finds that an injunction tracking the language of 15 U.S.C. §§ 78*o*(c)(3) & 78q(a) "may comply with Rule 65(d)" because, like the injunction in *Jacksonville Paper*, the provisions "contain specific commands and a defendant restrained from violating these commands would be able to determine what conduct the injunction addressed." *Goble*, 2012 WL 1918819 at *11.

In the discussion, the Eleventh Circuit includes an analysis—strikingly similar to *Sky Way Global*'s analysis—that distinguishes the *Jacksonville Paper* injunction and the FLSA from an injunction tracking the language of Section 10(b) of the Exchange Act:

> We reject the contention that Rule 65(d) provides the district court this discretion in *all* circumstances involving an injunction against violations of the securities laws. But, we also recognize that at times an injunction that orders a defendant to comply with a statute may be appropriate; Supreme Court precedent dictates this.
>
> In *McComb v. Jacksonville Paper Co.*, the Supreme Court upheld a decree that directed the defendants to obey the minimum wage, overtime, and record keeping provision of the [FLSA]. The SEC contends that *Jacksonville Paper Co.* validates the injunction here (including the portions of the injunction prohibiting violations of § 10(b) and Rule 10b-5). While the decree in *Jacksonville Paper Co.* may have ordered compliance with provisions of the [FLSA] . . . the terms of that statute were relatively specific. For example, the defendant knew the exact wage it was being ordered to pay, it knew the

(continued...)

*Sky Way Global*, 710 F. Supp. 2d at 1297-98.

The FTC's proposed injunction (Doc. 455-1, at 11) broadly and impermissibly prohibits the misrepresentation of "[a]ny material aspect of the performance, efficacy, nature, or characteristics of [a] product, service, plan, or program." The provision tracks the language of the Telemarketing Sales Rule but excludes the important limitations that the misrepresentation is "the subject of a sales offer" and that the misrepresentation occurs while conducting "telemarketing" (as defined in the regulation). *See* 16 C.F.R. § 310.3(a)(2)(iii) & (iv). Insufficiently specific, the provision essentially informs the defendants not to violate Section 5 of the FTC Act, 15 U.S.C. § 45(a), which prohibits "unfair or deceptive acts or practices in or affecting commerce," a prohibition of boundless proportion. Similar to Section 10(b) of the Exchange Act, and unlike the FLSA and the two provisions considered in *Goble*, the language proposed by the FTC (and Section 5 of the FTC Act) "prohibits

---

[1](...continued)
required overtime pay rate, and it could easily discern the records it was required to keep. In other words, while the decree enjoined violations of the statute, the terms of the statute were specific, and the defendant clearly knew what conduct the injunction addressed.

The same cannot be said for all orders enjoining violations of the securities laws. For example, if an injunction simply used the language of [Section] 10(b) of the Exchange Act or Rule 10b-5, a defendant reading the injunction would have little guidance on how to conform his conduct to the terms of the injunction. Indeed, that defendant would need to review hundreds of pages of the Federal Reporters, law reviews, and treatises before he could begin to grasp the conduct proscribed by [Section] 10(b) and in turn the injunction.

*Goble*, 2012 WL 1918819, at *11.

- 9 -

an expansive, indefinite category of acts and omissions, generally encompassing any imaginable fraudulent or deceptive scheme . . . [, and provides] a limitless array of scenarios sufficient to warrant a sanction for contempt." *See Sky Way Global*, 710 F. Supp. 2d at 1297 (discussing a proposed injunction that prohibits the violation of certain securities laws); *accord Goble*, 2012 WL 1918819 at *11.

Rule 65(d) and *Jacksonville Paper* permit a moderate and precise injunction limiting the prohibited misrepresentation to a particular "line of business." Because, as discussed in Part II, above, the injunction will forbid the defendants' attempt to market any and every debt-relief product or service, the injunction necessarily forbids any misrepresentation about a debt-relief product or service—without the inclusion of a global prohibition against misrepresentation in general.

### III.  Duration

The FTC proposes a perpetual injunction; the facts warrant a ten-year injunction. Citing *United States v. Grant*, 345 U.S. 629, 633 (1953), and finding that the defendants create a "cognizable danger" of a recurrent violation, the April 23, 2012, order (Doc. 454) approves the FTC's request for an injunction because:

> [E]ach defendant for years has engaged in the loss mitigation business, because each defendant has easily transferred from one loss mitigation company to the next, because [] Bishop and McDaniel have founded at least four loss mitigation companies between 2004 and 2009, because Caldwell was employed by at least three loss mitigation companies during the last ten years, because each defendant has the technical knowledge to operate a loss mitigation company, because Bishop and McDaniel began Legal Admin Services only a few months before the

> entry of the TRO, and because the economic barriers to enter the loss mitigation industry are minimal.

*Washington Data*, 2012 WL 1415323, *30; *see also SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1322 (11th Cir. 1982) (quoting *SEC v. Blatt*, 583 F.2d 1325, 1334 n.29 (5th Cir. 1978) (considering "[t]he egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.")). During ten years of absence from the debt-relief industry, during ten years of absence from telemarketing a financial service, during ten years of sworn compliance, and during ten years of notifying business partners, employees, and others of the injunction and the violation, the "cognizable danger" of recurrence declines linearly.

Time and again throughout the litigation, the FTC has portrayed the defendants as criminals who operated a fraudulent business that preyed mercilessly on vulnerable homeowners. However, the defendants were found civilly liable not for operating a scam but for deceptively marketing a service. The defendants' business helped many homeowners reduce a monthly payment and save a home from foreclosure. Prohibiting the marketing and sale of a debt-relief product or service and the telemarketing of a financial product or service, an injunction prudently limited to ten years, protects consumers without unnecessarily or disproportionately punishing the defendants.

### IV. Injunction

The defendants are enjoined for ten years as follows:

### *A. Definitions*

"**Debt-relief product or service**" means a product or service, including a mortgage-assistance product or service, designed or purportedly designed to negotiate, settle, or alter the terms of a debt or obligation.

"**Defendant**" means Richard A. Bishop, John Brent McDaniel, and Tyna Caldwell. "**Other defendant**" means Washington Data Resources, Inc.; Optimum Business Solutions, LLC, a/k/a Attorney Finance Services, LLC, and d/b/a Attorney Finance Services; Crowder Law Group, P.A., f/k/a Jackson, Crowder & Associates, P.A., and d/b/a Legal Support Services; Douglas A. Crowder; Bruce Meltzer; and Kathleen Lewis.

"**Financial product or service**" means a product or service, including a debt-relief product or service and a mortgage-assistance product or service, designed or purportedly designed to assist a consumer attempting to receive credit or improve a credit rating.

"**Mortgage-assistance product or service**" means a product or service designed or purportedly designed to assist a consumer with preventing or postponing a foreclosure sale or a repossession of the consumer's dwelling or with modifying a term of either a residential loan or a residential "short sale."

"**Person**" means a natural person and a corporation or other business entity. "**Servicer**" means a person that performs loan or credit account administration or processing services. **"Sworn"** means that a document complies with 28 U.S.C. § 1746. "**Telemarketing**" means a plan, program, or campaign that uses a telephone and involves more than one interstate telephone call to induce the purchase of a good or service.

### *B. Prohibitions*

The defendants shall not (1) market or provide or assist a person in marketing or providing a debt-relief product or service; (2) telemarket or assist a person in telemarketing a financial product or service; (3) attempt to collect, sell, or assign a right to collect money from a consumer who agreed to purchase a mortgage-assistance product or service from the defendant or an other defendant.

### *C. Consumer Information*

The defendants shall not disclose or use consumer information, such as a name, address, telephone number, email address, social security number, other identifying information, or data that enables access to a customer's financial account (including a credit card, bank account, or other financial account), that a defendant or other defendant obtained by operating Washington Data Resources, Inc.; Optimum Business Solutions, LLC, a/k/a Attorney Finance Services, LLC, and d/b/a Attorney Finance Services; Crowder Law Group, P.A., f/k/a Jackson,

Crowder & Associates, P.A., and d/b/a Legal Support Services; or Legal Admin Services, Inc; and Meltzer Law Group. On or before thirty days after the entry of this injunction, each defendant shall destroy consumer information in the defendant's possession, custody, or control. The defendant shall destroy consumer information in a manner that immediately and finally prevents further access to the information.

### *D. Delivery of Assets*

On or before fourteen days after the entry of this injunction, a person receiving actual notice of this injunction and holding, controlling, or maintaining an account or an asset subject to the asset freeze (Docs. 35, 67, 406) shall deliver the account or asset to the FTC. After delivery of the account or asset to the FTC, the asset freeze shall terminate without further judicial action.

### *E. Injunction Acknowledgment*

On or before fourteen days after entry of the injunction each defendant shall submit to the FTC a sworn acknowledgment of receipt of this injunction.

For a business of which the defendant is the majority owner or which the defendant controls—collectively with a defendant, collectively with an other defendant, or individually—each defendant shall deliver a copy of this injunction (1) to each principal, officer, director, and manager and (2) to each employee, agent, and representative who offers a financial service or product. For current personnel, delivery must occur on or before thirty days after entry of this injunction. For future

personnel, delivery shall occur on or before fourteen days after the individual or defendant begins work. The defendants shall save a copy of each acknowledgment and deliver a copy to the FTC upon request.

### *F. Compliance*

No sooner than one year after entry of this injunction and no later than July 12, 2013, and every two years thereafter, each Defendant shall submit to the FTC a sworn attestation of compliance with this injunction and designate a preferred and effective medium for the FTC to contact the defendant during the forthcoming two years.

Each defendant is responsible to ensure delivery of the biennial compliance report to Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue, NW, Washington D.C. 20580. The subject line shall begin: FTC v. [the defendant's first and last name], Matter No. X100011.

### *G. Judgment*

A judgment is entered for the FTC and against the defendant Bishop and the defendant McDaniel, jointly and severally, in the amount of $1,974,270. A judgment is entered for the FTC and against the defendant Caldwell in the amount of $664,704.

The defendants shall deposit money paid to the FTC into an account administered by the FTC and used for consumer redress. The FTC shall deposit into

the United States Treasury money not used for consumer redress. Judgment interest shall accrue in accord with 28 U.S.C. § 1961(a).

Jurisdiction is retained to construct, modify, and enforce this injunction.

ORDERED in Tampa, Florida, on June 8, 2012.

*Steven D. Merryday*
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE